```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3  UNITED STATES OF AMERICA :
                           :
 4                         :
                           :
 5      vs                 :    3:CR-19-09
                           :
 6                         :
                           :
 7  BRUCE EVANS, SR. & BRUCE :
    EVANS, JR.             :
 8                         :

 9
        BEFORE:        THE HONORABLE MALACHY E. MANNION
10                     UNITED STATES DISTRICT COURT JUDGE

11      PLACE:         COURTROOM NO. 3

12      PROCEEDINGS:   FINAL PRETRIAL CONFERENCE

13      DATE:          TUESDAY, SEPTEMBER 28, 2021

14
    APPEARANCES:
15
    For the United States:
16
    MICHELLE OLSHEFSKI, ESQ.
17  U.S. ATTORNEY'S OFFICE
    P.O. BOX 309
18  235 NORTH WASHINGTON AVENUE
    SCRANTON, PA 18501
19
    For Defendant Bruce Evans, Sr.:
20
    PATRICK A. CASEY, ESQ.
21  MYERS, BRIER & KELLY LLP
    P.O. BOX 551
22  SCRANTON, PA 18501-0551

23  For Defendant Bruce Evans, Jr.:

24  BERNARD J. BROWN, ESQ.
    58 8TH AVENUE
25  CARBONDALE, PA 18407
```

1          THE COURT:  Are your clients here today?

2          MR. CASEY:  Judge, I did speak with my client, and I

3    didn't -- I didn't bring him with me today.

4          THE COURT:  Normally in a criminal case the

5    defendants are physically present.  I can't remember having a

6    final pretrial conference without having the defendants

7    physically present for it.  Is there some written waiver?  This

8    is an important aspect of their criminal prosecution.  Do we

9    have a waiver of their right to be here?

10          MR. CASEY:  I don't.  I don't, Judge.  That's my

11    error.

12          THE COURT:  Off the record for a second.

13          (A discussion was held off the record.)

14          THE COURT:  Back on the record.  So then it's the

15    United States of America against Bruce Evans, Sr., and Bruce

16    Evans, Jr.  The criminal number in the case is 3:CR-19-9.

17    We're here for a final pretrial conference.  Now, Mr. Casey,

18    you are here representing Mr. Bruce Evans, Sr.; is that

19    correct?

20          MR. CASEY:  Yes, Your Honor.  I regret not having him

21    here, but I will confer with him and prepare an affidavit or

22    declaration so that the Court is assured that all what

23    transpires here is reviewed with him.

24          THE COURT:  Mr. Brown, you represent Mr. Bruce Evans,

25    Jr.?

1    MR. BROWN:  I do, Your Honor, and we will do the same

2  thing.

3    THE COURT:  Okay.  First of all, I do appreciate that

4  counsel have filed a status report.  Mr. Brown, you filed a

5  document indicating his not being here was on his own volition

6  with the consent of counsel.

7    MR. BROWN:  That is correct, Your Honor.

8    THE COURT:  I do appreciate the filing of the joint

9  status report.  We wanted to kind of clear up a lot of things

10 that don't need to be truly addressed as we go through it.  The

11 first of those in the joint status report is we will move the

12 trial to November 15th as requested by the parties in the case

13 and so we will do that by an order.  In reviewing it, it

14 appears that you're really in general agreement as to

15 everything except the issue of Brady and Giglio material.  Is

16 that correct?

17    MS. OLSHEFSKI:  Yes, Your Honor.

18    THE COURT:  Okay.

19    MR. CASEY:  Yes, it is, Judge.

20    THE COURT:  I know there's a formal motion on that.

21 I think it's document 38 or -- and the briefing has been

22 handled on that document 39, and the government's response was

23 document 50 something.  I did note that in the defendant's

24 request for the material, you seem to have itemized a number of

25 things that you believe somehow fit into that category.  In the

1  government's response it appeared to be more general as to

2  whether Giglio or Brady material needs to be given a prior to

3  Jencks time, but I didn't see really a direct response to some

4  of the particular allegations or requests that were being made.

5  So I wanted to kind of just address some of those.

6          It appears to me -- and we will do a written ruling.

7  It appears to me for the most part, Mr. Casey, that most of the

8  material that's listed in there is material that assuming that

9  there is some Brady or Giglio content to it or potential -- the

10 reason I say that is some of your arguments include the fact

11 that you believe there might be inconsistent statements in some

12 of the statements of other individuals.

13         You know, an inconsistent statement is often in the

14 eye of the beholder of the statement.  As we tell the jury

15 during the closing by counsel that they'll hear one counsel and

16 say there's a reasonable inference to be drawn in this

17 direction and the other counsel will say the other direction.

18 That to me is not Brady or Giglio material.

19         And so with respect to that, most of what I read

20 clearly in my mind assuming the government is aware of its

21 Brady and Giglio obligations -- and there's no doubt that Ms.

22 Olshefski is aware of those obligations.  I'm assuming that if

23 there's exculpatory information or information that was in

24 there that would be favorable to the defense that was not

25 co-extensive with Jencks material that they would provide that.

1  An example would be -- I would note that it appears that you

2  also have access, at least some access, to almost all of the

3  individuals who you have named in there that you were concerned

4  about them potentially having provided the government with

5  Brady or Giglio material.

6          For example, I believe that you said Mr. -- what was

7  his name, Mr. Randt, there was an allegation that when he was

8  first approached by the government in general and asked if

9  anyone had done anything wrong, his answer was no, and so you

10 were requesting that information as Brady or Giglio material to

11 the extent that it was included in the statement by the

12 government agent at the time.

13         First of all, you know, the purpose of Brady material

14 is to make sure that the defense is aware of any information

15 that's, in fact, exculpatory.  It appears by those statements

16 you are aware that -- at least in good faith made an allegation

17 that he has made that statement and have access to the

18 individual to the extent that he may or may not wish to speak

19 with you, which is, of course, his determination along with his

20 counsel if he has counsel, but I don't know that I consider

21 that kind of response necessarily to be Brady or Giglio

22 depending on what the substance of the remainder of the

23 statement is and whether or not it was recanted at a later

24 time.

25         There's no question you're entitled to that.  The

1  real question becomes is there some surprise that would evolve

2  to you if you did not get that information prior to the Jencks

3  material turnover time.  Technically under 3500, of course,

4  that doesn't have to get turned over until after the witness

5  has testified.  As a practical matter, we all know that the

6  government turns that information over at some point before

7  trial, normally the weekend before or something of that nature.

8          So as I read through, you know, most of those notes,

9  which seem to -- or most of those requests which seem to

10  indicate a request for information that for the most part seems

11  co-extensive to me with Jencks material that you would receive

12  that material at Jencks time, secondly, that the government may

13  rightfully have the determination that what you believe may be

14  Brady material they don't believe is, in fact, Brady material.

15          Having said that, of course, it is their obligation

16  to turn over any Brady material that is there, and I assume Ms.

17  Olshefski takes that seriously.  So if we get to trial and

18  there was, in fact, Brady material that was not co-extensive

19  with Jencks material that was not turned over in advance but

20  was requested in advance, we can cover that issue at that

21  particular time.  But in the interim, I would like, Ms.

22  Olshefski, you to respond to the individual Brady requests that

23  were made in there.

24          There are -- looks like there are nine or ten of

25  those that were made concerning statements and just your

position as to why each one of those are either not Brady

material or to the extent that they could be considered Brady

material that they are co-extensive with Jencks material that

you intend to turn over at the time of trial. You know, the

Courts are pretty much clear on that judges should not be doing

in camera review of material to decide whether they -- the

judge thinks it's Brady or not Brady. That's really the

application of the government.

As I said, if it turns out that you've become aware

that there was clearly Brady material it was not turned over in

time such that it prejudiced you in some way, we can argue that

at that particular time. But as of right now, it appears to me

the government is aware of its obligation, that the information

that is listed in there may include potential Brady material

co-extensive with Jencks material. If so, Jencks time is a

timely production of that. To the extent that -- I don't see

anything in there that appears to me to be screaming out that

it's Brady material and the government is just not turning it

over in time.

MR. CASEY: Judge, may I?

THE COURT: Yeah.

MR. CASEY: I know that the Brady concept applies

sometimes uniquely to each case. I just thought for the

benefit of the government if the Court -- just to expound a

little bit on basically the three individuals about whom I

1 think there's Brady material.  Two are very similar, Mr.

2 Klepadlo and Mr. Sheposh, operators of the Greenfield Township

3 Sewer Authority.  During all of the relevant times of this

4 case, they were the operate -- at least Mr. Klepadlo was the

5 operator from, I think, 1983 to 2000 -- the end of 2017.  The

6 search warrant was executed on 12/12/17.

7 　　　　　All of the allegations that relate to my client are

8 within that window.  They start in 2013, and they go to 2017.

9 The allegation -- the primary 23 counts against my client are

10 focused on alleging that my client illegally operated the sewer

11 facility in violation of the permit and that that's a crime and

12 he did so knowingly.

13 　　　　　All of the paper on this case, all of the evidence

14 that I have seen from D. E. P. would call him the business

15 manager and a laborer, not the operator, not the person making

16 decisions on how the plant runs.  So that's the context in

17 which I would suggest to the government there may be Brady

18 material and statements by Mr. Sheposh and Mr. Klepadlo.

19 　　　　　And the expectation that I would have about their

20 statements would be the following:  Neither one of them would

21 say that Bruce Evans, Sr. was the operator.  Neither one of

22 them would say Bruce Evans, Sr. operated the plant, which is a

23 distinction the government appears to be making more recently

24 that, okay, he's not the operator by paper but he must have

25 participated in the operation.

1          Neither of them would say that Bruce Evans, Sr.

2   understood or knew the limitations of the N. P. D. E. S.

3   permit.  I don't know what that means, but that's an acronym

4   that relates to some federal regulation.  Both of them,

5   Klepadlo and Sheposh, have admitted to violating -- knowingly

6   violating the permit with respect to the Greenfield Township

7   Sewer Authority plant, and neither of them fault Evans in their

8   violations of the plant.

9          Both of them, Klepadlo and Sheposh, have admitted to

10  falsifying reports to conceal their violations of the permit

11  with respect to the Greenfield plant.  Neither of them would

12  say Bruce Evans, Sr. knew that they were falsely reporting that

13  the plant was operating within the permit when it was not.

14  Both would say that Bruce Evans, Sr. would have had an

15  expectation that they were properly testing and properly

16  reporting the results of that test.

17         And finally, as to Klepadlo, it's my understanding

18  that the F.B.I. when they executed a search warrant offered to

19  provide leniency to him in exchange for him to doing a

20  consensual telephone call with Bruce Evans, Sr., which never

21  occurred, meaning he elected not to participate in it.  Now,

22  there's one other person the Court mentioned, Mr. Randt.

23  Different category, different backdrop.

24         My client is charged in count seven with having

25  received graywater.  Mr. Randt ran a company called Northeast

1   Portables with Porta Johnny's out on the fracking pads.  The

2   waste from that went to other sewer plants including Greenfield

3   Township.  Bruce Evans, Sr. and Thomas Randt knew each other,

4   and the government says that that friendship was reduced to a

5   agreement or a contract for Northeast Portables to deposit or

6   unload the graywater at the plant and then at one of the

7   pumping stations and then at a second pumping station over the

8   course of time.

9          As I understand it, this is one of the primary

10  reasons this got as much focus as it did, as the government

11  looked at Mr. Randt had received checks from his own company --

12  or from the oil companies to his company and he didn't deposit

13  all of this money.  He kept significant amounts of cash to

14  himself, and the -- logically enough the F.B.I. thought that

15  maybe he was paying some kind of a kickback or a bribe to this

16  municipality to take the graywater, and they suspected Bruce

17  Evans, Sr. was one of those that agreed to receive something of

18  value or cash from Mr. Randt over a period of time.  And Mr.

19  Randt deposited the graywater from 2011 as it's alleged in the

20  indictment -- relying on the indictment's allegations to June

21  of 2015, extended period of time.

22         The F.B.I. I surmise got Mr. Randt's bank records and

23  then interviewed him more than once on this particular issue,

24  and Mr. Randt in my view -- my understanding -- I have not

25  spoken to him -- it's my understanding he exculpated Bruce

1  Evans, Sr. and said, he didn't take a nickel, it was done
2  transparently, Northeast Portables wrote checks to the
3  Greenfield Township Sewer Authority, those checks were
4  deposited, they were processed through the board meeting and it
5  was all cards up in terms of handling.

6        I would argue although that's -- my client in this
7  superseding indictment is not charged with bribery or kickback,
8  he's charged with intentionally violating the permit by not
9  accurately reporting the graywater that Randt was depositing at
10 the sewer authority and that he was making a false statement in
11 a document in doing so.  And I would argue to the Court and
12 argue to the government that if one were to step into Bruce
13 Evans Sr.'s moccasins for trial, that would be exculpatory,
14 meaning that his behavior in handling that whole matter with
15 which he's now charged as having participated in or lied about,
16 there's a witness who is on the other end of that whole
17 activity who would have said Bruce Evans, Sr. did not take
18 anything of value from me to do this and he handled it in a
19 transparent fashion.

20       So those are at least the reasons why I would ask the
21 Court or -- and/or the government to consider providing to me
22 Brady material those statements, and I would welcome the Court
23 to look at them in camera.  But I understand Your Honor's
24 ruling and view of that, and we respect it.  But I would be
25 happy with that circumstance if the government were of the mind

1  or the Court were of the mind to consider this matter.

2  THE COURT:  I think it's the government's obligation

3  to produce, and they bear with that the risk of not producing

4  information that, in fact, turns out to be Brady if it was.

5  Let me go back for a second on that last the discussion you had

6  concerning Mr. Klepadlo and Mr. --

7  MR. CASEY:  Sheposh.

8  THE COURT:  -- Sheposh.  So the government hasn't

9  charged your client with taking any bribes or anything of that

10  nature, correct?  I mean, the allegation against him is that

11  the graywater that went in, whether it was paid for or not paid

12  for, the bottom line was the formal filings with the state were

13  falsified concerning that?

14  MR. CASEY:  Yes, that's correct.

15  THE COURT:  So assuming that Mr. Sheposh received

16  money from fracking companies and that he paid some to the

17  township but others unaccounted for, I'm not sure I am getting

18  how that is Brady material as to your client.

19  MR. CASEY:  Well, I don't mean to -- just to be

20  clear, Sheposh and Klepadlo ran the plant.  And in a simple

21  version, I think their acknowledgment of having run the plant

22  in violation of the federal law and then having falsely

23  reported it is tantamount to three people being at the scene of

24  a crime, two people saying, it wasn't this guy, it was me and

25  this guy.  I mean, it's pretty exculpatory in my judgment.  The

1 second thing is Thomas Randt --

2     THE COURT:  Isn't that what the jury is going to

3 decide?  Obviously, the government thinks differently.  I

4 assume they're going to be offering proof that would indicate,

5 you know -- and this is not a good example -- but if John Gotti

6 went to trial and he was the top of the organization, it very

7 well may be that the people underneath him in the organization

8 would say, he had nothing to do with it, it was just us.  You

9 know, circumstantial evidence might prove otherwise.

10     I don't know what the story is here.  The mere fact

11 that you believe that two of the individuals who have pled

12 guilty are somehow -- you know, that they're not going to be

13 implicating your client, the government may have a different

14 perspective as to whether they will be, in fact, by either

15 their actions or inactions or the circumstantial evidence

16 around how things happened did implicate your client.

17     I don't know the answer to any of those things

18 because I don't know the case as you all know the case, but --

19     MR. CASEY:  By virtue of them not implicating them,

20 they can exculpating them.

21     THE COURT:  That's incorrect.  That would be the same

22 as anybody else who didn't implicate them being somehow

23 exculpation.  Implication and exculpation are not the same.

24 And even if exculpation is, you know, disingenuous, again I

25 don't know the circumstances -- but if there are statements

1  related to that, it sounds to me -- I could be wrong -- are we

2  anticipating that they will end up being witnesses at trial?

3            MR. CASEY:  I most certainly think they are going to

4  be witnesses at trial.

5            THE COURT:  Is the government expecting they will be

6  witnesses at trial?

7            MS. OLSHEFSKI:  Your Honor, only Klepadlo was charged

8  and pled guilty.  Sheposh was not charged.  Klepadlo and the

9  defendants are both involved with -- in civil lawsuits now.

10  They are all blaming each other now against the sewer

11  authority, and they're not charged with the same crimes.

12  Klepadlo was charged for what he did and pled guilty.  Both

13  Evans, Sr. and Evans, Jr. are charged for their own crimes on

14  separate dates.

15            MR. CASEY:  I will take issue with that.  They

16  absolutely overlap.

17            THE COURT:  I get that, Mr. Casey.  That's kind of

18  what, you know, trials end up being about people taking

19  different perspectives.  My concern here is not related to all

20  the underlying facts, not who is guilty or not guilty or

21  anything else, but whether or not there's true Brady/Giglio

22  material that is not co-extensive with Jencks material that you

23  will get and that would cause some unfair surprise that you

24  would all of a sudden find out there's evidence indicating that

25  your client was not guilty of the offense charged that you were

1  not aware of, and I am having a hard time presently figuring

2  out -- while I understand you may be able to use some of the

3  information that you have gotten by what you said to me

4  favorably to you, and I am sure you will do a good job in that

5  regard.  I don't know there isn't a different perspective on

6  that or whether it relates to the actual crimes that your

7  client is charged with as opposed to crimes others are charged

8  with or crimes that nobody is charged with and that somehow

9  just have a bad feeling about them.

10       But I think at this stage, I'm -- I will first give

11 Ms. Olshefski an opportunity to respond to you.

12       MR. CASEY:  Just one follow-up.  The Randt -- the

13 third guy, Randt, there was actually no -- there were no bribes

14 paid whatsoever, and the investigation came to Randt.  They

15 interviewed him a couple times on the suspicion that Bruce

16 Evans, Sr. had taken bribes.  I just want to make sure.

17       THE COURT:  I'm sorry.  I said Sheposh, but I meant

18 Randt in terms of the taking the graywater in.  Okay.

19       MS. OLSHEFSKI:  So the interviews of Randt, Your

20 Honor, involve -- they are multi-faceted.  The fact that he was

21 asked whether or not any cash exchanged hands is not

22 exculpatory.  He said, I know of nothing that he did wrong.

23 They are not charged with taking bribes or charged with

24 exchanging cash.  And the fact that he said, I never paid him

25 cash is -- he's obviously aware of it.

1        And also the focus on Klepadlo and Sheposh being the

2    licensed operators of that plant during this period of time,

3    they absolutely were, which is why one would be left to wonder

4    why the Evans -- especially Mr. Evans, Sr. was caught in the

5    act on multiple occasions operating the plant such that we have

6    alleged environmental violations because he was operating the

7    plant, and the statute is any person.  It doesn't say any

8    licensed person.

9        So if I were doing what Mr. -- the Evans are charged

10   with doing, I would be charged with these crimes as well

11   because of my conduct, not because I am licensed or not

12   licensed.  I will also say that what Klepadlo or Sheposh know

13   -- what -- whether or not what Mr. Evans knows or doesn't know

14   is -- how would they know that?  I mean, that's what we are

15   going to prove at trial.  It's not an intentional violation.

16       It's a knowing violation, and knowledge can be

17   inferred from the facts.  And that's what we intend to show the

18   jury.  As I indicated, they're not charged with the same crimes

19   that Mr. Klepadlo was charged with overall.  I know that the

20   defense at trial is going to be putting Klepadlo and Sheposh on

21   trial to somehow alienate the evidence from the purview of the

22   jury.  That's going to be a battle I think will occur at trial,

23   but they are not charged with the same crimes.  The crimes

24   occurred within the same time period but different acts.

25       And as I said, they're all blaming each other now.

1  There's a civil lawsuit going on.  The sewer authority sued

2  Klepadlo.  Klepadlo sued both the Evans, and they countersued,

3  and it's all going on now.  Whether or not and who will testify

4  at trial, I don't know yet.  But I will certainly live up to my

5  obligations.  If there's Brady material, it will be turned

6  over.  Just because someone said, he didn't take money, he's

7  not charged with taking money.

8         So there could be a lot of questions that are asked

9  during the investigation, did he do this or do that, no.  Well,

10  he's not charged with that.  So that's not Brady.  And as I

11  said, I will scan these records again.  He has everything.  He

12  has more than is even relevant in this case in his effort to

13  put Klepadlo on trial.  And whether -- what Mr. Evans knew

14  about the permit that was assigned to him, delivered to him and

15  in which he enacted for the better part of two decades, that

16  will be up for the jury to decide, Your Honor.

17         MR. CASEY:  One further point.  Mr. Klepadlo was paid

18  $3,000 a month for 20 years to maintain and operate the sewer

19  authority, not Mr. Evans.  That's why it's exculpatory.  The

20  fact that Klepadlo pled guilty to same statute, 1319 of Title

21  33 and he pled guilty to illegally operating and issuing false

22  statements as a consequence, very exculpatory to a man who is

23  not the operator, was a laborer and the -- it's the exact same

24  period of time they are trying to hold my guy responsible for

25  operating the same plant illegally.  That's my last --

1    THE COURT:  Well, in looking through the requests, I

2   am going to generally deny your request, Mr. Casey.  To the

3   extent that -- as I read through all of these that to me it's

4   not articulable they are, in fact, undoubtedly Brady and Giglio

5   material at this time.  I am satisfied that the government

6   counsel is aware of her obligation under Brady and Giglio and

7   that she will supply you with any information that fits within

8   that either after -- as she said, she will review her

9   documentation again -- or to the extent that any of it is

10  information that is co-extensive with Jencks material, you will

11  get that at Jencks time.

12         In particular looking at your original motion, you

13  requested all audio recorded conversations between Joseph

14  Sheposh and Daniel Klepadlo.  Again, don't take this wrong, in

15  request for Brady and Giglio material, all recordings doesn't

16  exactly tell us anything other than they had a conversation or

17  may have had a conversation, but that's not what Brady or

18  Giglio are about.  They're about exculpatory information in

19  there.

20         I assume that if that -- if there is such an audio

21  recording and it's going to be used at trial at some point it

22  will be turned over to you if it's going to be an exhibit used

23  at trial.  All understandings, agreements or grants of

24  favoritism or leniency to Joseph Sheposh by the government,

25  that's kind of classic Jencks material that gets turned over at

1   the time that, you know, usually plea agreements when there's a

2   cooperating witness or things of that nature.  So that appears

3   to be extensive again with Jencks material assuming that Mr.

4   Sheposh would be a government witness.

5           All offers of leniency or favoritism by the Scranton

6   F.B.I. to David Klepadlo in exchange for his cooperation

7   against Bruce Evans, Sr. on March 18th, 2016, again to the

8   extent that there were such offers, they again strike me as

9   being kind of your classic Jencks material that is -- would be

10  turned over to you.  All notes of all agents executing search

11  warrants on David Klepadlo's home and office on March 18th, I

12  don't know the particular relevance of March 18th, 2016 to the

13  charges in the indictment, but assuming that -- that they are,

14  in fact, relevant I would assume that to the extent that

15  there's any Jencks material there either by the agents or that

16  it's a Court record that's required to be turned over, the

17  government will, in fact, do that.  All interviews of Thomas

18  Randt by the Scranton F.B.I. and federal agents regarding the

19  G. T. S. A., Greenfield Township Sewer Authority, and Bruce

20  Evans, Sr., again citing Brady versus Maryland, again, the idea

21  of all interviews makes it sound like I want to get everything

22  that he said when, in fact, Brady is not everything.  It's not

23  Jencks.  They're not the same thing.  I know you know that.

24          I also know that you need to ask for as much as you

25  can get and hope you get something, but it appears to me that

1  kind of fishing expedition boilerplate large bald statements

2  made by him don't necessarily fit into the question of Brady.

3      But to the extent there is Brady or Giglio in there,

4  again, it sounds to me like information that would be

5  appropriately produced at Jencks time.  Criminal records of

6  Joseph Sheposh and any other government witness in the case, I

7  would assume the government will also turn over if there are

8  criminal records they're aware of any of their witnesses that

9  they will turn those over to you.  Statements and summaries of

10  statements taken by the F.B.I. and other federal investigators

11  that were told by witnesses any of the following -- and you

12  list a number of things that Mr. Evans is an honest person -- I

13  assume that Mr. Evans did not accept things of value in order

14  to accept waste or discharge at the G. T. S. A., Bruce Evans,

15  Sr. did not know Joseph Sheposh was falsifying taking samples

16  and thereby obtaining false laboratory relates, Bruce Evans,

17  Sr. was a manager and not an operator of the G. T. S. A., Bruce

18  Evans did not engage in any criminal activity, members of the

19  G. T. S. A. authorized purchases of federal government claims

20  were unauthorized, Bruce Evans, Sr. was not involved in the

21  operation of the G. T. S. A -- it appears to me a lot of that

22  kind of -- some of it is certainly the crux of what the case is

23  about.

24      You know, I don't know that an operator is a term of

25  art.  I understand you're using it more precisely as a term of

1   art.  The government is using it more broadly as somebody who

2   was involved in running the place.  We will wait to see how the

3   evidence produces it.  I don't know that Ms. Olshefski properly

4   says the statute doesn't refer to a licensed operator or some

5   -- what I'll call definitional response.  It could be a lot of

6   people are running and doing things in that place that would

7   qualify on any given day as operating on that day.

8           I don't know what the answer is, but the jury will

9   ultimately decide once they heard the evidence whether or not

10  Mr. Evans, Sr. or Jr. fits into the category of operator.  I

11  know you will make a very cogent argument as to why that's not

12  the case, and Ms. Olshefski will make a cogent argument as to

13  why that is the case.  Inconsistent statements of Joseph

14  Sheposh, members of the G. T. S. A. or other government

15  witnesses again, in that case, you know, as I said earlier, the

16  jury always gets advised that once they heard all of the

17  testimony that you often can draw a different inference from

18  testimony, and one side will ask you to draw one inference and

19  the other will as you to draw the other inference.

20          I don't know the government is in a position to

21  decide what you think would be inconsistent for purposes of --

22  you may see something as inconsistent that they don't see as

23  inconsistent with that but -- finally, any evidence that any of

24  the government witnesses are drug abusers, you can certainly --

25  I mean, if the government is aware that they were drug abusers

1  at the time of the incidents in question, to the extent that it

2  would appear to be either relevant to the findings, I guess at

3  some point they should tell you that.  Aside from that, you

4  know, you're free to ask on -- if you have a good faith basis

5  on cross examination of any witness if you believe that to be

6  the case and had a good faith basis -- the question -- and I

7  certainly know you long enough you don't ask questions without

8  a good faith basis -- that you can ask that question of those

9  witnesses.

10         If the government is aware there's some drug problem

11  somebody has in or around the time of this particular activity

12  that would affect their ability to cogently remember what

13  occurred or whatever, then I would assume they would advise you

14  of that.  But aside from that, as I said, it just doesn't

15  appear to me that the government is unaware of its obligation

16  under Brady.  I know we can parse what Brady is, and again each

17  side has a different perspective on what Brady is.

18         I tend to see in this case that to the extent any

19  material is, in fact, Brady it appears to me this was generally

20  co-extensive with Jencks and that you would get those

21  statements that you will argue later will be inconsistent with

22  some other statements, and I am sure you're going to find a ton

23  of things that you in your cross examination believe to be

24  perhaps inconsistent with what somebody else said or recorded

25  at an earlier time or especially when they take multiple

1   statements.  Normally there's always some inconsistencies

2   between those statements.  That's something you will be able to

3   argue in time.  It's also clear to me that you got a pretty

4   factual basis and have a lot of information concerning the

5   parties in this particular case.

6           The concern in my mind with Brady is not only it be

7   turned over in enough time to make sure that the defense is not

8   prejudiced by the result of not having the opportunity to

9   investigate that material, and it doesn't appear that's the

10  case here.  Based upon all of those, I am going to deny the

11  request or motion for Brady material to the extent the

12  particular requests are made, but I am going to direct the

13  government to comply with their obligations in supplying the

14  defense with any Brady or Giglio material that they are aware

15  of as soon as they become aware of that to the extent that the

16  information is co-extensive with Jencks material and there's

17  presiding case law they can supply that at Jencks time and that

18  is considered timely, all right.

19          So that appears to me to cover all of the matters

20  that we have outstanding in terms of motion practice.  Is there

21  something else?

22          MR. CASEY:  Just one follow-up, Judge.  On the

23  subpoena --

24          THE COURT:  Oh, yeah, the subpoena.  The parties

25  agreed and stipulated to that?

1          MR. CASEY:  We're modifying the dates from 2015 so --

2          THE COURT:  I appreciate both you agreed to that.  So

3 do you have the subpoena?

4          MR. CASEY:  I don't have it physically with me.

5          THE COURT:  Why don't you just amend the date?  Make

6 sure you supply a copy to the government.  You can serve

7 Pennsylvania D. E. P.  Was that who it was?

8          MR. CASEY:  Yes, down in Wilkes-Barre.

9          THE COURT:  Okay.  That's agreed to by the parties.

10 I appreciate your agreement.

11          MR. CASEY:  I don't know what the Court's preference

12 is, but I had a couple things that were not brought up.  It

13 would be helpful if the defense could have an inspection of the

14 Greenfield Township Sewer Authority and take some pictures the

15 interior and exterior.  I know Harry Coleman is counsel to the

16 board.  So it would be appropriate probably for Ms. Olshefski

17 and I to just vet with him a time and date --

18          THE COURT:  I certainly have no problem with that.

19 You can take, you know, pictures of -- it's a public owned

20 entity.  I imagine if you have permission from them, you don't

21 need permission from anybody else.  I don't have a problem with

22 that.  I do appreciate you making sure that counsel on the

23 other side is notified so both parties have an opportunity to

24 be there at the same time if they need to so if there's any

25 questions later about authenticity or any questions about, you

1  know, both sides having equal opportunity that you both do

2  that. What else?

3  　　　　MR. CASEY: I also would like to compose and

4  circulate to counsel first and then to the Court additional

5  questions for the jury, questionnaire. I have not -- I

6  composed something, but I didn't get it out in time to get it

7  to Ms. Olshefski. So I will get it to her tomorrow. But I

8  just want to --

9  　　　　THE COURT: My general practice is as you probably

10  know and that is, that I allow counsel to be actively involved

11  in the jury selection. So I will ask those kind of standard

12  questions that we ask the jurors, and then I will allow counsel

13  to ask questions. I normally advise counsel please don't try

14  your case in jury selection, fair and reasonable questions

15  concerning the ability of the jurors to be fair and impartial

16  in the case, understanding that, of, course that they need to

17  have some sense of what the case is about, and they will

18  certainly have that. Perhaps the best practice would be

19  prepare your questions, share them with Ms. Olshefski, and

20  hopefully both sides can work out that they are agreeable to

21  the verbiage or wording on the questions so there isn't any

22  kind of surprise or nobody has to stand up in front of the jury

23  and object to the other side's questions. So you can have an

24  opportunity to see those in advance, all right.

25  　　　　MR. CASEY: And in the past at times the Court has

1  approved the mailing of the additional questionnaire to the

2  jurors so they have time privately to fill it out so --

3       THE COURT:  I generally don't do that.  First of all,

4  we're never a hundred percent of which jurors will show up.  I

5  also don't generally want to have the jurors doing any research

6  on a case that they may be involved in by, you know, somehow

7  figuring, like, well, okay, I want to find out what this case

8  is about.  I try to spend a good period of time making sure the

9  jurors do no research of any kind so all they learn about the

10 case is within the four corners of the courtroom.

11      So while I will certainly entertain it, you can talk

12 about it with each other, it's honestly unlikely that I will do

13 that because, as I said, my concern is I don't want people I

14 don't -- have not met yet haven't heard one item from me who

15 now decide it and will take it upon themselves if they can read

16 or learn or search the internet about people, names and places

17 and things of that nature.  But so that's -- I won't say it's

18 denied, but I am saying it's highly unlikely that I am going to

19 agree to that.

20      But I certainly have no problem with the two of you

21 working out, you know -- sharing with each other the questions

22 that each side thinks they will ask so that if there's any

23 disagreements as to verbiage we can handle that beforehand and

24 not have to have hopefully any objections during the

25 questioning itself that would make either counsel look like

1  they're either trying to hide something or they're upset about

2  something.

3          MR. CASEY:  There was one other item, but I think it

4  will raise it with Mrs. Olshefski later.  It's just a discovery

5  thing.

6          THE COURT:  All right.  So based upon that --

7          MR. BROWN:  I have one more, and I just wanted to let

8  you know I gave Ms. Olshefski a binder of my client's medical

9  records.  And the reason why I did that is after being charged

10 on December 8th, 2019 he had a car accident and he has been --

11 has a traumatic brain injury for which he goes to the hospital

12 a lot.  When I meet with Mr. Evans, Jr., I can only meet with

13 him for about an hour, an hour and a half.  So I don't know as

14 far as how to handle that with the jury if he were to need to

15 maybe mis portions of it because of the fact that, you know,

16 it's affecting his brain or if he would need multiple breaks in

17 the periods of time, I just wanted to raise it at this point

18 just to let you know.

19          I can only really meet with him for about an hour at

20 a time.  So I just wanted -- as far as whether he needs to be

21 in the courtroom the whole time, he will be here during the

22 most important parts, the parts which are obviously jury voir

23 dire, and I will try to keep him here as often as possible, but

24 I wanted you to be aware of that.

25          THE COURT:  All right.  Well, I think the best we can

1  do on that is cross that bridge as we come to it.  Obviously if

2  somebody has a medical reason for not being able to be here, we

3  can give some neutral explanation to the jury that it's

4  appropriate for him for some reason that's unrelated to their

5  determination in the case that he is not present at certain

6  times and then go on from there.  We will figure out a way to

7  work around that.

8          MR. BROWN:  Okay.

9          THE COURT:  In terms of, you know, kind of our

10  procedural particulars, as I said, we're going to move the

11  trial date from October 18th, 2021 to November 15th of 2021 at

12  the request of counsel in the case.  I am going to ask that the

13  parties submit their requested points for charge by November

14  1st.

15          Now, with respect to the points for charge, you know,

16  the first half of the charge is normally those standard

17  instructions that occur in every criminal case.  You can

18  probably pull from the public records and dockets what I

19  charged before in criminal cases.  This is different because of

20  the charge that's here.  But the first half of the charge is

21  normally that standard instruction that goes in every case,

22  credibility, burden of proof, number of witnesses , you know,

23  all of those matters that are appropriate.

24          The reason I mention that is that, you know, I am

25  probably going to give my standard charge in that regard.  If

1   there's something particular or different you feel needs to be

2   given -- but for the most part it strikes me you probably don't

3   need to be submitting charges on most of that unless there's

4   something unusual that you want to charge.  What I am always

5   interested in is the substantive charge in the case, and so

6   counsel should submit hopefully a joint proposed charge as to

7   the substance.

8          I want to talk a little bit about charges.  I

9   normally use the standard Third Circuit jury instructions.  I

10  don't know if there is a standard Third Circuit jury

11  instruction on these particular charges.  If there is, that's

12  what we will be using.  If there isn't, then we should look to

13  other circuits for their standard jury instruction on these

14  charges.

15         The reason I say that is that standard jury

16  instructions for the most part are tried and true, and so I

17  like to stay with them.  I virtually never charge snippets from

18  cases.  And the reason I don't do that is with all due respect

19  to many of my colleagues around the country, you can find a

20  snippet that almost says anything.  They carry very little

21  weight with me, snippets from cases.  And so what I really am

22  looking for are tried and true instructions that have been

23  given and hopefully affirmed before.

24         That's why I would ask that the parties with respect

25  to the elements of the offenses charged that you exchange with

1 each other your ideas of what that charge should be.  Now, it's

2 important to note that although I am asking you to submit a

3 request to charge by November 1st, this in no way forecloses

4 you in any way from requesting that we add or delete other

5 charges as the trial goes on.

6 I say that because before we finish the trial, I will

7 hold a charge conference, and we will then decide are there

8 additional charges we need to add based on what's been -- what

9 the proof has shown or anything we need to take out because

10 it's not no longer in the case.  The idea behind November 1st

11 is it gives us an opportunity to print and get prepared on the

12 charge as opposed to the day before trying to do an entire

13 charge.

14 So while it's important that you give me everything

15 that you think you are going to reasonably need in that charge

16 by November 1st, you are not foreclosed in any way as a result

17 of that if there's something additional we need to add or take

18 out in there.  Again, I appreciate counsel submitting to each

19 other their charges so I am not just reading two charges

20 submitted by each side that are basically the same.  So run

21 your language by each other.  See if you can work out any

22 differences that are related there.

23 You do need to agree upon a verdict slip.  The

24 parties need to agree upon a verdict slip in the case.  So you

25 need to get together and ultimately submit a joint proposed

1  verdict slip in the case.  That would be by November 1st as

2  well.  Again, that's without prejudice to any changes we need

3  to make depending on what happens once the trial is actually

4  completed and presented.

5         If you intend to use the JERS system, you know, the

6  electronic presentation of evidence, by November 11th, you need

7  to submit to us a disc in P. D. F. format that includes your

8  exhibits.  Again, that does not prejudice you from adding or

9  deleting other exhibits as the evidence requires in the case.

10 It just gives us an opportunity to upload what's there so we

11 can smooth and upload and bring up what needs to be brought up

12 and marked and admitted when it's admitted so it can go back to

13 the jury using the JERS system later on.

14         I anticipate you will stipulating to a lot, in other

15 words, the authenticity of records and I -- I would certainly

16 hope --

17         MS. OLSHEFSKI:  Your Honor, I've been advised by

18 counsel that there will be no stipulations to anything.

19         MR. CASEY:  We're not stipulating to lab reports.  If

20 they want to bring in expert opinion on what the contamination

21 was, they can call those witnesses.  I am not ruling out

22 entirely stipulations.  But in that area I would not entertain

23 a stipulation.

24         THE COURT:  Well, I guess what I would like to do is

25 make sure that stipulations as to authenticity -- I assume

1  there's a lot of records in this case, they were, in fact,

2  records of the Greenfield Township Sewer Authority.  There

3  should be no reason why most of those cannot be stipulated to

4  and agreed by the parties.  If there's some concern about, for

5  example, a lab report, you want to cross-examine the person

6  there because you're challenging their findings on the lab

7  report, you're entitled to do that.  I don't have a problem

8  with that.

9          What I am more concerned with is that we're not going

10  to waste time bringing in, you know, some secretary in

11  Greenfield Township to say this document that nobody is truly

12  arguing is not from Greenfield Township on that date is not

13  what it purports to be, not that's it's admissible, not what it

14  purports to be.  It's authenticity.  I don't want to waste time

15  with authenticity.

16          There may be other things in the course of the case

17  you can agree to and stipulate to that no party has a good

18  faith basis to challenge.  Those things you have a good faith

19  basis to challenge them, challenge them.  You have a right to

20  do that.  That's not a problem.

21          MR. CASEY:  Just on the point, as the Court

22  perceives, there are a lot of records, and I think authenticity

23  that's an issue we can get past and bank records and Greenfield

24  Township, American Express card receipt they're going to put in

25  -- but an additional thing I will raise and not asking for

1  comment so the Court knows and the government knows, there

2  might be a D. E. P. report and there could be a half a dozen

3  people spoken about or speaking within that document, could be

4  boot strapping a bunch of hearsay in -- I just want to be

5  sensitive to that and to the -- the expert opinions and lab

6  reports just so everybody knows what my concern would be.

7  THE COURT:  Yeah, and that's completely okay.  You

8  know, I know that in medical malpractice cases, you know,

9  medical records sometimes go in and sometimes don't go in their

10  entirety because there's, like, 25 people that have said

11  something that's not there.  Some of it is relatively

12  unimportant and unchallengeable, and that's not usually a

13  concern.

14  I understand if there's any information that's

15  concerning, then, you know, it's the obligation of whoever is

16  going to present the evidence to make sure that what's in there

17  is supported by the testimony if necessary of live people

18  because you can't cross-examine the document.  My concern

19  really is more with I don't want to waste time on stuff nobody

20  is disagreeing is authentic or nobody is disagreeing, you know,

21  should go in and, you know, that everybody understands it is

22  those I'm more concerned with, things that have -- there's a

23  good faith basis to challenge their admissibility and/or

24  authenticity.  That's okay.  You're entitled to do that.  I

25  don't have a problem with that.

1    It seems to me there's a lot of stuff you can work

2  out that will not have us dragging the case on for no

3  particular good reason when nobody is truly in good faith

4  alleging that it's not what it purports to be or something of

5  that nature.  That's not the same whether it's admissible.

6  It's just as to its authenticity.  The two of you will

7  hopefully work those things out, or the three of you will work

8  those things out.

9    We will again the trial on the 15th at 9:30 in the

10  morning here.  My guess is we're going to be under COVID

11  protocols unfortunately.  So the result of that is that it will

12  be a little -- won't be as smooth as we like it to be and more

13  disjointed.  We will do our best.  You can see the courtroom

14  has its Plexiglass everywhere.  If we are, and I would expect

15  and anticipate fully, that we will be still using the COVID

16  protocols.  Counsel will be required to ask questions from

17  either their counsel chair or from the podium.

18    I apologize for that because it's not the way I would

19  want someone to have to try a case.  But we can't let people

20  walk around the courtroom.  And the reason I say that is that

21  there are 16 seats in the jury box.  We put four people in the

22  back so there's a seat separating each of them.  There's four

23  that sit in the row before them so there's a seat between each

24  one of them.  You can see four chairs in front of the jury box,

25  so four individuals will be there.  This way everyone can be

1  safely socially distanced and at the same time have good

2  observations of what is going on.  In light of the fact they

3  are sitting in front of the jury box it precludes the ability

4  to let counsel just kind of walk around to normally to ask

5  questions.  Everybody will be given their little plastic baggie

6  as many as you need.

7            When you go up to the podium if that's where you wish

8  to do your questioning from, you take your baggie with you, put

9  it over the microphone.  When you're done, you take your baggie

10 back with you so other counsel could put their baggie over.  In

11 between each witness we will sanitize both the lectern and the

12 witness area so when the next witness comes on we will be safe

13 as well.

14           When we do our jury selection, normally we would pack

15 everybody into the courtroom and do our selection.  We will

16 probably do it in two jury selections both the same day right

17 after another.  We will divide the number of jurors into two

18 bringing half of them into the courtroom at one point in time

19 so that we can safely have them socially distanced.  We will go

20 through the entire questioning process with group one, and we

21 will also do outside of the hearing of the jury any challenges

22 for cause with group one and excuse group one and do group two

23 and repeat the same process.

24           We will do any challenges for cause with group two.

25 Then we will have them back into one of the courtrooms where

1  they will be sitting.  Once we have done that then what we will

2  do is we will come back in and then we'll probably then need 34

3  jurors.  So when we divide them to bring them in, let's say

4  there is 50 jurors just as an example.  25 will come in group

5  one numbers one through 25.  We will do their questioning and

6  do their challenges for cause.  They will go back to a

7  courtroom and sit.

8          We will in bring group two, 26 through 50, do all the

9  questioning, do our challenges for cause.  We will send them

10  back.  After we finish that, they are all back there.  And

11  let's suppose there are 40 jurors left and ten were challenged

12  for cause for whatever reason and they are excused and there's

13  40 left as an example.  The defense will have 11 peremptory

14  challenges in the case.  The government will have seven.  It's

15  normally six and ten.  We're going to pick two alternate

16  jurors.  What do you expect the length of the case to be?

17          MS. OLSHEFSKI:  Ten days to two weeks.

18          THE COURT:  Mr. Casey, your estimate of the trial,

19  your time?

20          MR. CASEY:  If we put a defense on, Judge, I guess I

21  anticipate a couple days at the back end of the government's

22  case.

23          THE COURT:  Mr. Brown?

24          MR. BROWN:  A couple days, Your Honor, maybe one or

25  two.

1          THE COURT:  Figure the case will be two weeks or

2    whatever, maybe a little bit beyond that.  So based on that, we

3    may pick -- instead of two alternates, get four alternates just

4    to make sure.  If we do that, under the rules theoretically the

5    defense has ten peremptory challenges, the government has six.

6    You get one peremptory challenge for each two alternate jurors

7    that are to be selected, so that's why we normally we pick two.

8    I said the defense would get 11, the government would be seven.

9          Although the rule indicates that they should be

10   separate, I allow counsel to use their peremptory challenges

11   wherever they want to use their peremptory challenges.  If we

12   pick four alternates, then each one would get an extra

13   peremptory challenge.  The defense would have 12 altogether,

14   and the government would have eight altogether.  The reason I

15   use those numbers as an example would be if we were going to,

16   for example, pick 12 jurors and two alternate jurors, that

17   would be 14 jurors that would be selected.

18          If the defense in that circumstance had 11 peremptory

19   challenges and the government had seven peremptory challenges

20   total, that will be a total of 18 peremptory challenges.  So if

21   we take the 14 that will be selected and add to the 18, it

22   means we can't get past juror No. 32 or the first 32 jurors.

23   Normally instead of bringing all 40 back, I bring back maybe 34

24   just so we are safe in case someone got sick when they were

25   here, and we'd ultimately do your peremptory challenges because

1  we have already the done the challenges for cause.  If those 34

2  people in the first -- after you were done, the first 12 that

3  were left would be the regular jurors, and the next two, as the

4  example I use, would be the alternate jurors.  If we end up

5  four, then we extend that a little bit.  That's probably where

6  we will go just so you have some logistical idea what we are

7  going to do.

8          The government opens first.  Once we finish the jury

9  selection process, we will go directly into trial.  What I mean

10 by that, of course, if it's lunchtime, we will break or if it's

11 not lunchtime, we will certainly break to give counsel time to

12 get their acts together so to speak.  We will go directly into

13 trial in the case so the government should be prepared to have

14 witnesses even on that first day.

15         We do opening statements by the government and

16 opening statements by the defense, and the government would

17 begin to call its witnesses in the case until it has finished

18 its case.  The indictment reads Bruce Evans, Sr. and Bruce

19 Evans, Jr.  That means Bruce Evans, Sr., Mr. Casey will go

20 first in terms of cross examination, and then Mr. Brown will be

21 going second and follow the order that's in the indictment.

22         Similarly, once the government has completed their

23 case, if you do have witnesses or a case to present, same for

24 Mr. Casey, your client will go first, and, Mr. Brown, your

25 client and whatever presentations you wish to make will go

next.  The government has the option for rebuttal.  When we

know the case is coming to a close, I will certainly ask the

government as they are getting to the end of their case to make

sure you are aware of that, the defense, so you can be prepared

with your witnesses.  Similarly, as you get through your case

and completing at any given date, make sure the government is

aware of that so if the government has rebuttal that they are

prepared and we don't lose any half days because we finish at

11:00.

        We go every day from 9:30 until 5.  We try to break

at a time that is logical.  So if we are finishing a witness at

4:50, unless there's a very, very short witness, we will not

start another witness.  If we need to go to 5:20 to finish the

direct and cross of a witness, we will do that so we can kind

of try to make as best we can continuity.  I don't like to

break in the middle of anywhere.  A former colleague of mine at

4:00 used to break because he ran at Lake Scranton.  And you

can be in the middle of a sentence, and he was breaking at that

period of time.  That was the end of it.

        At the conclusion of the rebuttal the government

would have, then I will charge the jury first.  Then counsel

will close after I charged the jury, and that's part of the

reason we ask you to give us those requested points for charge

early because we will prepare a written charge in the case of

which counsel will have, and you're free to refer to that

1   charge in the course of your closings as you see appropriate

2   because I will have charged the jury.  The jury will also

3   receive a written copy of the charge but not until they go back

4   to deliberate.

5           So I want them to listen as I tell them what the law

6   is.  You'll have a copy of the charge, and you can use that in

7   your closings as you see fit.  When they leave to deliberate,

8   we will give them a written copy of the charge so if they have

9   questions about the law they can certainly look to that copy of

10  the charge to see if that -- whatever their question may be.

11          After I charged, the government will do its closing

12  followed by Mr. Casey, followed by Mr. Brown, followed by

13  rebuttal by the government.  Then after that, I will give the

14  jury what I call housekeeping instructions on how they should

15  perform their jury deliberations.  Whenever the jury gets the

16  case -- we will go from 9:30 to 5 basically every day.  We will

17  break for an hour and ten minutes at lunch so the jury has time

18  to get where they want to eat and get back and have 45 minutes

19  to enjoy their lunch.

20          On the day the jury gets it, once they get the case,

21  we're completely at their discretion.  So if at 5:00 they say,

22  we're tired and want to go home, we will break for the day and

23  come back the next day.  If they want to stay until 2:00 in the

24  morning, we will stay until 2:00 in the morning.  So once they

25  get the case, we're on their schedule, not on our schedule.  So

1　we should prepare that accordingly.  If you need to approach a

2　witness for purposes of showing them something that's physical,

3　it's not going to be just on the electronic screen or whatever,

4　I'm fine with that.  We just need to kind of be careful in

5　terms of our protocol on, again, keeping socially distanced

6　from the jurors and even from the witness in the box.

7　　　　　We will be wearing masks because I normally -- with

8　the jury trial we are supposed to start yesterday -- and to my

9　shock the last trial I had, I asked the jurors beforehand how

10　many were vaccinated, and probably 75 or 80 percent were

11　vaccinated, and yesterday's of 40 some jurors almost half were

12　not vaccinated.  I was shocked by that.

13　　　　　But be that as it may, we don't know what the mix

14　will be, and so we'll be wearing masks.  When you ask

15　questions, you can certainly take your mask off at the podium

16　or at counsel table.  Is everybody here vaccinated?  Yeah.  In

17　that regard, I don't know whether Mr. and Mr. Evans or

18　vaccinated or not.  But to the extent that at counsel table

19　when you're questioning that you wish to take off your mask --

20　other than that, you're going to have to wear it.  I will be

21　wearing mine even though I am socially distanced from everybody

22　because I feel like it's important for the jury to feel we're

23　all in the same boat so to speak in terms their not being

24　punished somehow.

25　　　　　And so we will all be wearing those for safety

1 purposes. If counsel needs it, we will take a break in the

2 morning and break in the afternoon. If you need a break, let

3 me know and we will take a break. I would ask you to keep any

4 sidebar conferences to an absolute minimum. I am okay with

5 speaking objections. Make your objection, and I'll rule on it.

6       This isn't law school. It's the real world. So we

7 will try to keep our case moving as best we can. I think

8 that's all that I can think of off the top of my head. Usually

9 John turns around and tells me, you forgot to ask this. But

10 then that being said, so, Mr. Casey --

11       MR. CASEY: Judge, do you have a rule as to whether

12 evidence goes out to the jury or --

13       THE COURT: Yes. Evidence goes out to the jury. The

14 jury -- anything that's admitted into evidence the jury is

15 entitled to see, and so it all goes out to the jury. I

16 remember that same judge on one case the jury went out and the

17 evidence was all sitting there. I'm, like, are we going to

18 send the evidence back, and his answer was, not unless they ask

19 for it. So then every trial I had with him afterwards the

20 first thing I told the jury, the first thing you should do is

21 go back there and ask for every piece of evidence that's been

22 admitted. That used to tee him off actually.

23       That's the evidence in the case. So they are

24 entitled to have it all, and they can look or not look or

25 whatever it is they want to look at or not look at. It's all

1    going back.  With respect to the evidence, I will -- I do ask

2    you when you refer to evidence you refer to it by a number so

3    the record is clear and that, secondly, that right before we're

4    ready to finish I'll have counsel go through each other's

5    exhibits to make sure everybody is in agreement what has been

6    admitted into evidence so there's no misunderstanding what's in

7    or not in, what the jury is going to get, all right.  What

8    else?  Anything else from you, Mr. Casey?

9         MR. CASEY:  No, Your Honor.  Thank you.

10         THE COURT:  Mr. Brown?

11         MR. BROWN:  No, Your Honor.  Thank you.

12         THE COURT:  Ms. Olshefski?

13         MS. OLSHEFSKI:  No, Your Honor.  Thank you.

14         THE COURT:  Thank you.

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

    I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

the United States District Court for the Middle District of

Pennsylvania, appointed pursuant to the provisions of Title 28,

United States Code, Section 753, do hereby certify that the

foregoing is a true and correct transcript of the

within-mentioned proceedings had in the above-mentioned and

numbered cause on the date or dates hereinbefore set forth; and

I do further certify that the foregoing transcript has been

prepared by me or under my supervision.




                        s/ Laura Boyanowski, RMR,CRR
                        Laura Boyanowski, RMR, CRR
                        Official Court Reporter

REPORTED BY:

    LAURA BOYANOWSKI, RMR, CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    235 N. Washington Avenue
    Scranton, PA  18503


        (The foregoing certificate of this transcript does not
apply to any reproduction of the same by any means unless under
the direct control and/or supervision of the certifying
reporter.)