# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**  :  **3:CR-19-09**

                     **v.**  :  **(JUDGE MANNION)**

**BRUCE EVANS, SR. and**  :
**BRUCE EVANS, JR.,**
                             :
       **Defendants**

## M E M O R A N D U M

On November 9, 2021, a motion to quash the subpoena to testify at the trial of defendant Bruce Evans, Sr. was filed by David Klepadlo, pursuant to Fed.R.Crim.P. 17(c)(2) (providing that "[o]n motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive"), and based on his 5th Amendment privilege against self-incrimination. (Doc. 132). Evans, Sr. opposes the motion, (Doc. 142), claiming that Klepadlo's conviction on related charges to the ones he currently is facing has become final and that Klepadlo cannot be re-tried on the charges so there is no basis to assert a 5th Amendment privilege.[1] The government has responded stating that "the United States will not provide Klepadlo with immunity for any offenses at issue in

---

[1] Since the court stated the factual background of this case in its August 19, 2021 Memorandum denying defendants' motions to dismiss, it is not repeated herein. (Doc. 104). Suffice to say that the trial in this case commenced on November 15, 2021, and Evans, Sr. has subpoenaed Klepadlo to testify when he presents his defense.

the on-going [Evans'] trial." (Docs. 149 & 150). The government states that "Klepadlo retains a valid Fifth Amendment privilege" against self-incrimination despite his guilty plea in 2018 to charges involving the Greenfield Township Sewer Authority system essentially since "the pending charges against Bruce Evans, Sr. and Bruce Evans, Jr. involve offenses that may implicate Klepadlo in criminal conduct unrelated to the offenses covered by his plea agreement." Additionally, the government states that "many of the counts which Evans Sr. and Jr. face could implicate Klepadlo depending on his answers."

Although the government contends that "Klepadlo has not sought immunity [for his testimony] from the United States", (Doc. 149 at 1), his counsel appears to have sought immunity in the motion to quash, (Doc. 132 at 5), stating that, in the alternative to quashing the subpoena, "it is requested that the United States grant, [Klepadlo] use immunity as to all issues raised during direct and cross-examination." In any event, as discussed below, immunity was specifically sought from the government for Klepadlo's testimony at the December 1, 2021 hearing, however, the government has refused to grant this request.

Initially, to the extent Klepadlo's motion to quash is brought pursuant to Fed.R.Crim.P. 17(c)(2), it is denied since he was personally served with Evans, Sr.'s subpoena on September 20, 2021, while he was residing at his home in

2

Clarks Summit, PA, and he subsequently decided to visit his daughter in California before his motion to quash was decided by the court.

The Fifth Amendment to the United States Constitution states, in pertinent part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." A person may invoke the privilege against self-incrimination in a variety of settings, including civil proceedings, at an administrative or judicial hearing, or in a setting that is investigatory or adjudicatory. *Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

As a general rule, "where there can be no further incrimination, there is no basis for the assertion of the privilege," *Mitchell v. United States*, 526 U.S. 314, 326 (1999). The Supreme Court has applied this principle to "cases in which the sentence has been fixed and the judgment of conviction has become final." *Id.*

Klepadlo seeks to assert his Fifth Amendment right against self-incrimination if he is called to testify at trial by Evans, Sr., and thus, he moves to quash defendant's subpoena to prevent him from being compelled to testify at trial. "It is well established that a criminal defendant may not call a witness if that witness— whether or not a codefendant—will merely be invoking his Fifth Amendment right not to testify." U.S. v. Kuzma, 2017 WL 11466600, *3 (D. Az. Sept. 18, 2017) (internal quotations and citations omitted). "It is appropriate for a trial court to quash

3

the subpoena of a witness who has indicated a constitutional right not to testify."

*Id*. (citation omitted).

As the court in Rigas v. Deloitte & Touche, LLP, 2014 WL 1365899, *3 (M.D.

Pa. April 7, 2014), explained:

> A person claiming a privilege under the Fifth Amendment "must be confronted by substantial and real, and not merely trifling or imaginary, hazards of incrimination." *United States v. Doe,* 465 U.S. 605, 614 n. 13, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) (citing *Marchetti v. United States,* 390 U.S. 39, 53, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968)) (internal quotations omitted). Nevertheless, "while the privilege protects an admission that on its own would support a criminal conviction, the privilege also protects admissions 'which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime.'" *Adelphia Recovery Trust v. Bank of Am., N.A.,* 75 Fed. R. Serv.3d 138, 2009 WL 5214981, *2 (M.D. Pa. 2009) (citing *Hoffman v. United States,* 341 U.S. 479, 487, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)). Furthermore, "[i]t is settled by the overwhelming weight of authority that a person who has waived his privilege of silence in one trial or proceeding is not estopped to assert it as to the same matter in a subsequent trial or proceeding." *In re Neff,* 206 F.2d 149, 152 (3d Cir. 1953).
>
> As a general rule, a witness should be required "to answer questions only if it is perfectly clear, from a careful consideration of all the circumstances in the case that the answer cannot possibly tend to incriminate the witness." *Nelson v. Pilkington PLC (In re Flat Glass Antitrust Litig.),* 385 F.3d 350, 371 (3d Cir. 2004) (quoting *United States v. Washington,* 318 F.3d 845, 856 (8th Cir. 2003)) (internal quotations omitted). Nevertheless, "[t]he witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself-his say-so does not of itself establish the hazard of incrimination." *Hoffman,* 341 U.S. at 487.

"[S]ufficient evidence is presented by a witness if a court can, by the use of

reasonable inference or judicial imagination, conceive a sound basis for a

reasonable fear of prosecution." <u>Rigas</u>, 2014 WL 1365899, *3 (quoting *In re Morganroth,* 718 F.2d 161, 169 (6ᵗʰ Cir. 1983)).

"Two situations in which the general rule is not operative." *Id*. First, "if a prosecution for a crime, concerning which the witness is interrogated, is barred by the statute of limitations, he is compelled to answer." *Id*. (citation omitted). Second, "[s]uspects who have been granted immunity from prosecution may ... be compelled to answer; with the threat of prosecution removed, there can be no reasonable belief that the evidence will be used against them." *Id*. (quoting *Hiibel v. Sixth Judicial Dis. Ct.,* 542 U.S. 177, 190, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)).

Moreover, "[t]he Sixth Amendment right of an accused [i.e., Evans, Sr.] to compulsory process to secure the attendance of a witness [Klepadlo] does not include the right to compel the witness to waive his Fifth Amendment privilege. Nor is an accused entitled to compel a prosecutor to grant immunity to a potential defense witness to get him to testify." *Trejo-Zambrano,* 582 F.2d at 464.

No doubt that "[w]hile the Fifth Amendment provides a privilege against self-incrimination, witnesses cannot relieve themselves of their obligations to answer questions by a 'mere blanket invocation' of the privilege." <u>U.S. v. Matthews</u>, 327 F.Supp.2d 527, 529 (E.D. Pa. 2004) (citation omitted). "A witness must invoke the privilege after being asked specific questions." *Id*. Further, since Klepadlo has

5

already admitted to criminal conduct regarding his employment by the GTSA, namely, submitting false statements with respect to analytical data to the PADEP in violation of the CWA, and since the statute of limitations for other possible criminal charges involving Klepadlo's work with the GTSA after December of 2016 has not expired, the court must look at each question proposed by the Evans', regarding Klepadlo's actions to determine whether the privilege is justified with respect to the particular question. *Id*. (citing *United States v. Yurasovich,* 580 F.2d 1212, 1220–21 (3d Cir. 1978)).

Based on the current posture of Klepadlo's motion to quash, the court issued an Order on November 19, 2021, and directed Klepadlo to appear in court on December 1, 2021, so that the court could conduct a colloquy of him outside of the jury's presence. (Doc. 143). The court stated that the Evans' defense counsels would be allowed to present the witness with the questions they would ask him during the trial, outside the presence of the jury, and Klepadlo's attorney would be allowed to inform the court if Klepadlo will exercise his right against self-incrimination under the 5th Amendment and if he will refuse to answer the questions. The court stated that it would then determine if any of the questions to Klepadlo call for potentially incriminating responses.

On November 30, 2021, defendants jointly submitted their proposed questions for Klepadlo if he testifies at trial as well as their response to the

6

government's letter briefs. They argue that the government should grant Klepadlo's request for use immunity especially since his testimony would clearly be exculpatory to both defendants. (Doc. 157).

As a backdrop[2], Klepadlo, who was employed by the GTSA as the engineer and certified Waste Water Treatment Plant, ("WWTP"), operator of the plant since it began treating wastewater, was indicted on September 6, 2016, and charged with 16 Counts regarding his work at the GTSA and another wastewater treatment facility. Klepadlo pled guilty on December 20, 2018 to two counts of the indictment in case 16-cr-254, M.D. Pa., namely, Counts 4 and 16, false statements in violation of the CWA, 33 U.S.C. §1319(c)(4) and tampering with a witness, 18 U.S.C. §1512(c)(2).[3] On October 28, 2020, Klepadlo was sentenced on Counts 4 and 16 to imprisonment consisting of time served followed by a 3-year term of supervised release. As part of the plea agreement, the government dismissed the remaining 14 counts and "agree[d] that it will not bring any other criminal charges against the defendants [Klepadlo and his company Klepadlo & Associates, Inc.] directly arising out of the defendants' involvement in the offense(s) described above." (16-cr-254,

---

[2]Since the relevant factual background of Klepadlo's criminal case is detailed in the government's letter brief, (Doc. 149 at 1-2), it is not fully repeated herein. (Doc. 104).

[3]Judge Caputo was assigned Klepadlo's criminal case at the time of his guilty plea. Subsequently, Judge Caputo passed away and the undersigned sentenced Klepadlo. Judge Caputo was also originally assigned the Evans' criminal case, and the Evans' case was re-assigned to the undersigned.

Doc. 26, ¶ 4). As such, Klepadlo is currently serving his term of supervised release. (Doc. 90, 16-cr-254). Evans Sr. basically asserts that since Klepadlo has been convicted and has served his sentence this does not constitute sufficient "substantial and real ... hazards of incrimination" to warrant Klepadlo's invocation of his Fifth Amendment privilege. *Doe,* 465 U.S., at 614 n. 13. Evans Sr. further contends that Klepadlo cannot be re-tried for the crimes at issue that were filed against him and that are related to the charges filed against him involving their work for the GTSA.

Evans Sr. represents that Klepadlo has testimony that is "highly relevant and clearly exculpatory" to him, (*see* Doc. 142 at 19-20), and that his testimony is essential to his defense in the trial, including the fact that Klepadlo identified himself as the "operator" of the GTSA. Specifically, Evans, Sr. contends that Klepadlo's testimony is essential to [his] theory of defense" since "[his] testimony is directly material and relevant to whether the 'business manager' of the GTSA stepped out of that role and assumed the position of 'operator,' or whether Mr. Klepadlo at all times discharged the duties of 'operator.'" Thus, Evans Sr. claims that his 6th Amendment right to present his defense at trial will be greatly impaired and unduly prejudiced if he is prevented from calling Klepadlo as a witness. He also contends that Klepadlo does not have a foundation to assert his 5th Amendment privilege since he does not have a "sound basis for a reasonable fear

8

of prosecution" since he has been sentenced, he served his term of confinement and, his conviction is final.[4]

The government, (Doc. 149 at 2), responds that:

Evans, Sr. and Jr. are charged with fraud, environmental and other offenses involving the operation of the GTSA system. Unlike Klepadlo, they are not charged with submitting false analytical data to the PADEP. Rather, the CWA charges they face involve multi-year conduct involving various provisions of the GTSA's Clean Water Act permit, including numerous offenses which occurred while Klepadlo was plant engineer and one of the plant's two certified plant operators. (Doc. 62, Superseding Indictment, Counts 1-5, 7-24). In addition, Bruce Evans Jr. is charged with submitting a false statement to the PADEP concerning his qualifications to become a certified WWTP [Wastewater Treatment Plant] operator. Id. at Count 6. As the Court heard through the testimony of Laura Chambers, a PADEP employee, part of Evans Jr.'s application contained a certification by Klepadlo that Evans Jr. had worked for him since January of 2010 performing tasks at the GTSA plant that were relevant to PADEP's evaluation of Evans Jr.'s experience in operating such plants. In short, the United States believes that the information provided by Klepadlo about Evans Jr.'s WWTP-related work activity to be false. Evans Jr. submitted that document to PADEP in August, 2017; thus, the five-year statute of limitations has not yet run.

The law is clear that, "[if] the witness has pleaded guilty to a crime charged but has not been sentenced, his constitutional privilege remains unimpaired." *Mitchell v. United States,* 526 U.S. 314, 326, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999). However, Evans Sr. points out that Klepadlo is a witness who has pled guilty and is no longer awaiting sentencing and, thus cannot invoke his 5th

---

[4]Subsequently, Evans, Jr. joined in his father's response opposing Klepadlo's motion to quash, and the court addresses the issues herein as they pertain to both defendants.

Amendment privilege against self-incrimination since there are no further facts that may impact his sentencing. As such, Evans Sr. contends that there is no 5th Amendment privilege since Klepadlo has been sentenced and completed service of his term of incarceration, and since he contends that Klepadlo's judgment of conviction is final.

In U.S. v. Frierson, 945 F.2d 650, 656-57 (3d Cir. 1991), the Third Circuit stated:

> When, as here, a defendant pleads guilty to a crime, he admits his commission of that crime and waives his privilege as to the acts constituting it. *United States v. Yurasovich,* 580 F.2d 1212, 1218 (3d Cir. 1978); *Namet v. United States,* 373 U.S. 179, 188, 83 S.Ct. 1151, 1155, 10 L.Ed.2d 278 (1963); *United States v. Rodriguez,* 706 F.2d 31 (2d Cir. 1983); *United States v. Moore,* 682 F.2d 853, 856 (9th Cir. 1982). As this court has had occasion to note, however, "pleading guilty to counts involving one set of offenses [does not] by its own force ... waive a privilege with respect to other alleged transgressions for which charges are dropped, and which were not admitted."

In order for Klepadlo to assert the privilege against self-incrimination, he must be "confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination." *United States v. Apfelbaum,* 445 U.S. 115, 128, 100 S.Ct. 948, 956, 63 L.Ed.2d 250 (1980)

In U.S. v. Rivas-Marcias, 537 F.3d 1271, 1276-77 (10th Cir. 2008), the Tenth Circuit stated:

> At the heart of this case lies two important constitutional values: (1) a witness' privilege not to incriminate himself, and (2) a defendant's right to establish a defense. The former is grounded in the Fifth Amendment, which states that

"[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The latter is predicated on the Sixth Amendment's confrontation and compulsory process clauses, as well as the Fifth Amendment's guarantee of due process. *See United States v. Markey, 393 F.3d 1132, 1135 (10th Cir. 2004).*

Of course, an individual cannot avoid his duty to testify merely by voicing his own fears of self-incrimination and reciting the Fifth Amendment's familiar terms. *See Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); United States v. Castro, 129 F.3d 226, 229 (1st Cir. 1997).* For the privilege to apply, an individual must face "some authentic danger" of self-incrimination. *Castro, 129 F.3d at 229; see also Zicarelli v. N.J. State Comm'n of Investigation, 406 U.S. 472, 478, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972)* ("It is well established that the privilege protects against real dangers, not remote and speculative possibilities."); *Ullmann v. United States, 350 U.S. 422, 439, 76 S.Ct. 497, 100 L.Ed. 511 (1956)* (clarifying that the privilege's "sole concern" is with the "danger to a witness forced to give testimony leading to the infliction of 'penalties' affixed" to "criminal acts"). When no further danger of incrimination is present, the privilege ceases to apply. *See Mitchell, 526 U.S. at 326, 119 S.Ct. 1307; see also Brown v. Walker, 161 U.S. 591, 600, 16 S.Ct. 644, 40 L.Ed. 819 (1896)* (stating the prohibition against an individual being "compelled to testify against himself presupposes a legal detriment to the witness arising from the exposure"). Accordingly, the privilege generally remains available, absent a valid waiver, until an individual's "sentence has been fixed and the judgment of conviction has become final." *Mitchell, 526 U.S. at 326, 119 S.Ct. 1307.*

"[Courts] have repeatedly recognized, however, that the right to present a defense, "while fundamental, is not absolute." *Id.* at 1277 (citations omitted). "In appropriate cases, a defendant's right to present a defense must bow to accommodate legitimate, competing interests in the criminal trial process." *Id.* (citing *Serrano, 406 F.3d at 1215.* "Traditional testimonial privileges—including the Fifth Amendment privilege against self-incrimination—represent legitimate trial

interests sufficient to force a defendant's right to present a defense to give way." *Id*.

Thus, if Klepadlo has a cognizable 5th Amendment privilege against self-incrimination, neither defendant can show that his right to present a defense is unduly impaired. *See id*.

No doubt that the privilege against testimonial compulsion normally extends to an individual until his or her "sentence has been fixed and the judgment of conviction has become final." *Mitchell,* 526 U.S. at 326, 119 S.Ct. 1307.

In *Mitchell v. United States*, 526 U.S. 314, 326, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), the Court stated:

> It is true, as a general rule, that where there can be no further incrimination, there is no basis for the assertion of the privilege. We conclude that principle applies to cases in which the sentence has been fixed and the judgment of conviction has become final. If no adverse consequences can be visited upon the convicted person by reason of further testimony, then there is no further incrimination to be feared.

In U.S. v. Smith, 245 F.3d 538, 543 (6th Cir. 2001), the Sixth Circuit explained:

> [Co-defendant] rightfully invoked his Fifth Amendment right against incrimination even though he had already been sentenced. We held in *In Bank One of Cleveland, N.A. v. Abbe,* that "[a]lthough a defendant pleading guilty to an offense waives the constitutional privilege with regard to the offense admitted, he does not thereby submit 'a blanket waiver as to other offenses that might form the basis of later charges'" regardless of the defendant's sentencing status. 916 F.2d 1067, 1076 (6th Cir. 1990).

> The district court did not err in allowing [co-defendant who was already sentenced] to assert his Fifth Amendment privilege against self-incrimination at Defendant Smith's sentencing. The D.C. Circuit held in *Pardo* that the

privilege against self-incrimination is lost once a witness has been convicted of the offense with respect to which he fears incrimination, as well as when a witness pleads guilty to the offense in question, rather than being convicted at trial. *See Pardo,* 636 F.2d at 543. The privilege against self-incrimination is also lost where charges or counts of an indictment are dismissed as part of a plea agreement. *Id.* The court reasoned that "[s]ince promises to dismiss charges as part of a plea agreement are binding on the Government, a witness may not be exposed to prosecution on those charges, and the need for the privilege is lost." *Id.* Therefore, a co-defendant could not invoke his Fifth Amendment right regarding the events which surrounded a drug transaction because the co-defendant had already entered into a plea agreement with the government regarding the transaction. *Id.* at 543-44. "At the same time, it is equally true that a witness does not lose his Fifth Amendment right to refuse to testify concerning other matters or transactions not included in his conviction or plea agreement." *Id.* at 544 ("Pleading guilty to a crime does not waive the privilege not to incriminate oneself at other times in other crimes, any more than conviction of one crime erases the privilege as it relates to others.").

In <u>Rivas-Marcias</u>, 537 F.3d at 1277 n. 5, the Court noted:

The district court must decide, in the first instance, whether a witness' invocation of his Fifth Amendment privilege is justified. *See Castorena–Jaime,* 285 F.3d at 931; *United States v. Nunez,* 668 F.2d 1116, 1121 (10th Cir. 1981); *see also Hoffman v. United States,* 341 U.S. 479, 487, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) (explaining that the "trial judge in appraising" an individual's invocation of the privilege "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence"). No standardized procedure exists for making this determination. *See Hoffman,* 341 U.S. at 486–87, 71 S.Ct. 814. Rather, the Supreme Court has generally charged a district court with sustaining an individual's invocation of the privilege, regardless of setting, where it is evident from the implication of a question that a responsive answer, or explanation as to why it cannot be answered, "might be dangerous because injurious disclosure could result." *Id.* at 487, 71 S.Ct. 814; *see also Emspak v. United States,* 349 U.S. 190, 197, 75 S.Ct. 687, 99 L.Ed. 997 (1955) (stating that the individual invoking the privilege is not required "to disclose the precise hazard which he fears"). To avoid the general prohibition on calling a witness to the stand merely to compel him to invoke the Fifth Amendment privilege, however, a common practice has developed whereby the district court examines a

witness invoking the privilege outside of the presence of the jury. *See United States v. Melchor Moreno,* 536 F.2d 1042, 1046 (5th Cir. 1976) (describing this practice); *see also* 1 McCormick on Evidence §132 (6th ed.2006).

Here, it seems feasible that if Klepadlo testifies at trial and admits to committing criminal acts outside of his plea agreement, (and still within the 5-year statute of limitations), for which he was not convicted and sentenced, and which may constitute new criminal conduct involving his work at the GTSA, he may be subject to additional criminal charges and prosecution by the government.

"Whether an individual may properly invoke the privilege against self-incrimination is a question of law, ...." *United States v. Rivas-Macias,* 537 F.3d 1271, 1278 (10th Cir. 2008). The district court should have the witness testify outside the presence of the jury to determine whether he could invoke the 5th Amendment. Defense counsel who subpoenaed Klepadlo must present the proposed questions they would ask him during the trial and the court determines if they call for potentially incriminating responses. Klepadlo is entitled to 5th Amendment privilege if it is "'perfectly clear, from a careful consideration of all the circumstances in the case,' that [he] 'is mistaken' and his answers could not 'possibly have' a 'tendency to incriminate.'" *Rivas-Macias,* 537 F.3d at 1279 (quoting *Hoffman,* 341 U.S. at 488, 71 S.Ct. 814).

"[W]hen a witness invokes his Fifth Amendment right, the district court should confirm that he 'cannot possibly incriminate himself,' and if the 'witness's testimony

14

may make him vulnerable to prosecution, the trial court may allow him to ... refuse to testify.'" *Longstreet,* 567 F.3d at 922. "When a potential witness indicates that he will likely invoke his privilege against self-incrimination, the district court should ensure that the witness cannot possibly incriminate himself. If a witness's testimony may make him vulnerable to prosecution, the trial court may allow him to invoke his privilege and refuse to testify." U.S. v. Maybrok, 301 F.3d 503, 506 (7th Cir. 2002) (citing *Gleason v. Welborn,* 42 F.3d 1107, 1109 (7th Cir. 1994)." Additionally, "[defendant's] Sixth Amendment right to the compulsory process does not trump [the] Fifth Amendment right against self-incrimination [of co-defendant who had already been convicted of the offenses]." *Id.*

The Fifth and Sixth Amendments guarantee a defendant the "right to present a defense." *United States v. Markey,* 393 F.3d 1132, 1135 (10th Cir. 2004). This right includes presenting witnesses and cross-examining opposing witnesses. *See id.* It "is predicated on the Sixth Amendment's confrontation and compulsory process clauses, as well as the Fifth Amendment's guarantee of due process." *Rivas-Macias,* 537 F.3d at 1277. "[T]he right to present a defense, while fundamental, is not absolute." *Id.* at 1278. It "must bow to accommodate legitimate, competing interests in the criminal trial process ... including the Fifth Amendment privilege against self-incrimination." *Id.* "[T]he privilege against self-incrimination protects a witness as well as an accused party." *Rivas-Macias,* 537 F.3d at 1276

15

n.8. In determining whether the privilege applies, "[the court] must ascertain: ([i])
whether [the witness] faced some authentic danger of further incriminating himself
by testifying ..., and ([ii]) whether [the witness] waived his Fifth Amendment
privilege." *Id.* at 1278. "Not much is required ... to show an individual faces some
authentic danger of self-incrimination, as the privilege extends to admissions that
may only *tend* to incriminate." *Id.* S*ee also* U.S. v. Oldman, 979 F.3d 1234, 1253
(10th Cir. 2020). "[A]n individual does not lose his right to claim the Fifth
Amendment privilege merely because a successful prosecution is unlikely to add
to the punishments he already faces for other crimes." *Id.* "To the contrary, [the
court] will uphold an individual's invocation of the privilege against self-
incrimination unless it is 'perfectly clear, from a careful consideration of all the
circumstances in the case,' that the witness 'is mistaken' and his answers could
not 'possibly have' a 'tendency to incriminate.'" *Id.* at 1278-79 (quoting *Hoffman v.*
*United States*, 341 U.S. 479, 488, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)). "In making
this determination the judge must liberally construe the privilege in favor of the right
it was intended to secure." *United States v. Nunez,* 668 F.2d 1116, 1121 (10th Cir.
1981)). *See also Rivas-Macias*, 537 F.3d at 1280 (holding that a witness may
refuse to testify to avoid the possible "use of his compelled answers *and all*
*evidence derived therefrom* in any subsequent criminal case in which he is a
defendant") (emphasis original).

16

Here, the government asserts that "Klepadlo maintains a real danger of further criminal prosecution" since "Klepadlo's plea agreement does not cover all potential criminal charges which may arise from his actions at the GTSA plant and with Evans, Sr. and Jr. over many years." The government also points out that "[t]he offenses which Klepadlo faced in the September 2016 Indictment were addressed by his December 2018 guilty plea. These charges do not overlap with those faced by Evans, Sr. and Jr. except that some, but not all, of the charges involving Klepadlo took place at the GTSA plant. Moreover, the plea agreement does not contain an overarching promise that Klepadlo could never be prosecuted for all matters involving the GTSA plant regardless of time and subject matter." (Doc. 149 at 3-4).

The government, (Doc. 159 at 1-2), further elaborates on its position regarding whether the charges contained in Klepadlo's indictment overlap with the offenses charged against Evans, Sr. and Jr., and whether Klepadlo has the right to invoke his 5th Amendment privilege against self-incrimination, and explains:

> paragraph 31 of the Klepadlo indictment alleged that Klepadlo, his firm, and "others known and unknown to the grand jury, knowingly failed to properly operate and maintain the facilities and systems and treatment of control that were installed at the wastewater treatment plants and used to achieve compliance with the terms of conditions of the NPDES permit." However, paragraph 30 of the indictment limited the time frame of the alleged conspiracy to May, 2012, through June, 2014. The present indictment involving Evans, Sr. and Jr. only contains one count that occurred during that time frame – Count One. That count does not involve a failure to operate and maintain permit violation. Rather, it alleges a direct violation of another permit

17

condition by defendant Evans, Sr. None of the overt acts or the substantive Clean Water Act counts in Klepadlo's indictment go beyond the June 2014, time period. Therefore, the United States stands by its position that the charges against Klepadlo and those involving Evans, Sr. and Jr. overlap only to the extent that some of Klepadlo's charges involved the same wastewater treatment plant as the environmental charges involving Evans, Sr. and Jr.

On December 1, 2021, Klepadlo and his counsel appeared in court for a hearing outside of the jury's presence and counsel for defendants presented him with their proposed questions. (Doc. 157). The court then directed counsel for defendants, the government, and Klepadlo to meet and go over all of the proposed questions to determine which ones Klepadlo was willing to answer and which ones he was asserting his 5th Amendment privilege.

Counsel reported back to the court that with respect to Evans, Sr.'s proposed questions, (Doc. 157 at 2-4), Klepadlo was willing to answer questions numbers 1 through 5.[5] With respect to Evans, Sr.'s proposed questions numbers 6 through 19, Klepadlo indicated through his counsel that he was asserting his 5th Amendment privilege. With respect to Evans, Jr.' s proposed questions, Klepadlo was willing to answer numbers 1 and 2. Regarding Evans, Jr.'s proposed questions numbers 3 through 57, Klepadlo was asserting his 5th Amendment privilege.

---

[5]Since the proposed questions for Klepadlo submitted by both defendants are contained in their November 30, 2021 document, (Doc. 157 at 2-9), they are incorporated herein by reference.

Additionally, the issue of the statute of limitations arose regarding what conduct of Klepadlo could still result in possible criminal prosecution if he testifies. Here, the court finds that, in general, the applicable statute of limitations for any possible offenses at issue in this case is five years. *See* 18 U.S.C. §3282(a). As mentioned above, Klepadlo generally does not have a 5th Amendment privilege regarding any criminal conduct that is now beyond the 5-year statute of limitations period. Thus, it generally appears that any conduct involving Klepadlo, in any criminal wrongdoing, that occurred before approximately December 1, 2016, was outside of the applicable statute of limitations period.[6] However, the government argues the possibility that further conspiracy charges could be brought against Klepadlo stemming from his activities at the GTSA if he implicates himself, while testifying, in overt act beginning before but continuing into the 5 year statute of limitations period.

As directed at the hearing, the government, counsel for Klepadlo and counsel for Evans, Sr. timely submitted their supplemental letter briefs on December 3, 2021. (Docs. 159, 161 & 162, respectively).

The government's position is essentially that "acts committed by Klepadlo between the time period of September 6, 2016 (Klepadlo Indictment) through

---

[6]The technical statute of limitations would be 5 years before the day Klepadlo testifies in this case.

December 2016 could expose Klepadlo to criminal jeopardy and, therefore, Klepadlo retains the right to invoke his Fifth Amendment privilege against self-incrimination for that time period." (Doc. 159 at 1). This time frame, although seemingly outside of the statute of limitations period may involve a continuing conspiracy beginning before December 2016 but continuing into the present chargeable period which ran from December 2016 to December 2021.

Counsel for Klepadlo concurs with the government's position that Klepadlo has a valid 5th Amendment privilege with respect to any questions from the defendants "regarding any matters subsequent to his September 2016 indictment through the present." (Doc. 161).

In his letter brief, (Doc. 162), Evans, Sr. mainly focuses on the Smith factors regarding the government's decision not to grant Klepadlo immunity and alleges that it constitutes a violation of Evans Sr., and Evans Jr.'s due process rights. As such, the defense requests the court to dismiss, with prejudice, the superseding indictment, in its entirety. (Id. at 4). Evans, Sr. also contends that the government's "suggest[ion] [that] it may charge Mr. Klepadlo with a criminal conspiracy charge for conduct beginning between September 6, 2016 and December 2016", "is nothing more than a pretextual interest intended to induce Mr. Klepadlo to invoke his Fifth Amendment privilege for conduct he no longer maintains a viable privilege."

20

In U.S. v. Bornman, 559 F.3d 150, 153 (3d Cir. 2009), the Third Circuit explained:

> For a conspiracy indictment to fall within the statute of limitations, it is "incumbent on the Government to prove that ... at least one overt act in furtherance of the conspiracy was performed" within five years of the date the Indictment was returned. Grunewald v. United States, 353 U.S. 391, 396, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).
>
> "[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." Id. at 397, 77 S.Ct. 963.

Moreover, a conspiracy "is a continuing offense and a jury may consider each and all of a defendant's actions in furtherance of the conspiracy so long as the indictment is brought within five years of the last overt act." United States v. Amirnazmi, 645 F.3d 564, 592 (3rd Cir. 2011).

Thus, as the court in U.S. v. Schueg, 2015 WL 5311435, *2 (M.D. Pa. 2015), explained:

> the statute of limitations begins to run five years from the last overt act committed in furtherance of the conspiracy. United States v. Jack, 281 F.3d 123, 129 n. 6 (3d Cir. 2002). This overt act need not be the unlawful object of the criminal conspiracy itself, …, but rather it may be any outward manifestation, "however innocent in itself, done in furtherance of a conspiracy[.]" "Overt Act," Black's Law Dictionary (10th ed. 2014); see also United States v. McKee, 506 F.3d 225, 243 (3d Cir. 2007) ("An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy.").

21

Thus, any questions from defendants regarding Klepadlo's activities at the GTSA that are relevant to this case that occurred prior to September 6, 2016 will be allowed since no one, including Klepadlo, contends he has a 5th Amendment privilege for conduct that occurred before that date. The court does find that any questions of defendants regarding Klepadlo's activities at the GTSA that occurred on or after September 6, 2016 will not be permitted since Klepadlo has a valid 5th Amendment privilege with respect to this conduct.

As the government points out, "[t]he charges involving Evans, Sr. and Jr. directly implicate Klepadlo", in part, since "the CWA permit violations contained in Counts 1-5 and 7-24 concerning alleged crimes that occurred while Klepadlo was the GTSA engineer and a certified WWTP operator at the plant, and since "the defendants seem to claim that Klepadlo and his employee, Joseph Sheposh, not Bruce Evans Sr. (and presumably his son), are the true guilty parties ("business manager" vs. "certified plant operator")." In fact, the court notes that the CWA offenses against both defendants in Counts 2 and 3 allegedly occurred on October 17, 2017, and the CWA offenses in Counts 4 and 5 allegedly occurred on December 12, 2017. Also, the CWA offenses against Evans, Sr. in Counts 15, 22 and 24 allegedly occurred on July 26, 2017. The CWA charges in these Counts all allegedly occurred well within the 5-year statute of limitations period to the extent

that Klepadlo could possibly be charged regarding his work for the GTSA if he incriminated himself as a witness at trial.

Based on the proposed questions defendants would ask Klepadlo at trial, the court finds that most of the questions involve conduct that is potentially still within the 5-year statute of limitations period as extended by any overt acts in furtherance of a conspiracy, i.e., all conduct occurring on or after September 6, 2016, is conduct that Klepadlo could "reasonably" fear would implicate him in new crimes. Thus, it appears that if Klepadlo was to testify as a witness in the Evans trial and incriminated himself in crimes occurring on or after September 6, 2016, to which he did not plead guilty and which were not part of his plea agreement, he could be prosecuted for such crimes by the government. *See Doe,* 232 F.3d at 1263 ("'the privilege against self-incrimination does not depend upon the *likelihood,* but upon the *possibility* of prosecution' and also covers those circumstances where the disclosures would not be directly incriminating, but could provide an indirect link to incriminating evidence.") (emphasis original). Further, defendant does not have the right to force a witness to invoke his 5th Amendment privilege before the jury. *Hart,* 729 F.2d at 670. "[T]he jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense." *Nunez,* 668 F.2d at 1123

As such, the court has determined that Klepadlo can invoke his 5th Amendment privilege against self-incrimination regarding all of the proposed questions counsel for defendants would ask him at trial that involve his conduct relating to the GTSA that occurred on or after September 6, 2016. Counsel for defendants will be permitted to ask Klepadlo questions related to his activities involving the GTSA that were covered by the offenses he pled guilty to and related to his activities that occurred prior to September 6, 2016. *See* Matthews, 327 F.Supp.2d at 530 (holding that if there is the possibility that criminal charges could be brought against a witness within the statute of limitations, he has a substantial and real apprehension of incrimination).

Next, the court considers whether defendants' due process rights are being violated by the government's refusal to grant Klepadlo use immunity if he testifies as to all of their proposed questions. To be clear, at the December 1, 2021 hearing counsel for Klepadlo requested on the record that the government give him use immunity for his testimony and the government declined to give Klepadlo immunity. Only the government can give a witness use immunity. "The grant of witness immunity, reserved by statute to the Executive Branch, does not also reside with the Judiciary." Thus, in Quinn, the Court held that a district court does not have the inherent authority to grant a defense witness use immunity. *United States v. Quinn, 728 F.3d 243 (3d Cir. 2013)*. Defendants contend that by refusing to give Klepadlo

use immunity it will result in an unfair trial and a violation of their due process rights, and they request that all of the charges against them be dismissed, with prejudice, as a remedy. *Id*. at 259-60 ("If the Government refuses to immunize the witness in violation of the defendant's due process right, the trial court can dismiss the charges against the defendant.")

In *United States v. Quinn*, 728 F.3d 257-59, 261-62, the Third Circuit stated:

When a defendant alleges that the Government's refusal to immunize resulted in an unfair trial, he is challenging its statutory discretion in his case, …, and [i]f the defendant can show, as a *prima facie* matter, a witness's testimony is available, clearly exculpatory, and essential—in effect showing that the prosecutor's actions have impaired the ability to present an effective defense—we will consider the due process concerns raised regarding the Government's discretion to grant or deny immunity. [The prosecutor's power to seek or to refuse to seek immunity is limited by the defendant's right to due process of the law.] The five-factor test [for determining whether the Government's refusal to grant defense witness immunity denies a defendant due process used in Government of the Virgin Island v. Smith, 615 F.2d 964 (3d Cir. 1980)] aids this inquiry for prosecutorial misconduct, and we continue its use.

To prove a due process violation on the basis of the Government's refusal to immunize a defense witness, the defendant must show the following five elements: [1] Immunity must be properly sought in the district court; [2] the defense witness must be available to testify; [3] the proffered testimony must be clearly exculpatory; [4] the testimony must be essential; and [5] there must be no strong governmental interests which countervail against a grant of immunity.

"If the defendant can show, as a *prima facie* matter, a witness's testimony is available, clearly exculpatory, and essential—in effect showing that the prosecutor's actions have impaired the ability to present an effective defense—

25

[the court] will consider the due process concerns raised regarding the Government's discretion to grant or deny immunity." U.S. v. Gibson, 2020 WL 2849988, *3 (D. De. June 2, 2020).

"[W]here the actions of the prosecution have interfered with a defendant's right to present a defense, the prosecution may have engaged in prosecutorial misconduct. The Third Circuit has stated that a defendant asserting a prosecutorial misconduct claim has the substantial burden of showing 'that the government's decisions were made with the deliberate intention of distorting the judicial factfinding process.'" U.S. v. Yu Xue, 2018 WL 3647900, *6 (E.D. Pa. 2018).

In Yu Xue, 2018 WL 3647900, *6-7, the court explained:

This deliberate distortion test applies when the Government has taken steps to interfere with the testimony of a witness who would otherwise be available to the defense. For example, the prosecution has engaged in misconduct if the defendant can show that the Government's "[i]ntimidation or threats ... dissuade[d] a potential witness from testifying"—that is, "the [G]overnment's conduct ... 'substantially interfered' with a witness's choice to testify." 728 F.3d 243, 258 (3d Cir. 2013) (en banc) (alterations and omissions in original) (quoting Lambert v. Blackwell, 387 F.3d 210, 260 (3d Cir. 2004) ). "Whether substantial interference occurred is a factual determination." Lambert, 387 F.3d at 260.

The court in Yu Xue, 2018 WL 3647900, *7, further explained:

A showing of specific intent on the part of the government to interfere with a defendant's right to present a defense is not required. Quinn, 728 F.3d at 260. Instead, the focus is on "the effect of the prosecutor's actions on the process afforded to the defendant." Id. Although "[c]ourts should protect against deliberate wrongdoing by prosecutors, and in those rare cases where it arises, overzealous advocacy that distorts the factfinding function of

a criminal trial," they "should be hesitant, absent a strong showing by the defense, to determine that the Government has engaged in misconduct." *Id*.

"To show that the prosecution has violated her compulsory process, a defendant 'must at least make some plausible showing of how [the witness's] testimony would have been both material and favorable to h[er] defense.'" *Id*. (citation omitted). "Evidence is material only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact with a probability sufficient to undermine confidence in the outcome." *Id*. (internal quotations and citations omitted). "Courts have held that prosecutorial conduct directed at discouraging defense witnesses from testifying deprives a defendant of due process." *Id*. (citation omitted).

At the December 1, 2021 hearing, the court heard argument from defendants and the government regarding the Smith factors, and the parties addressed them in their letter briefs.

As to the first Smith factor, "defendants must seek immunity for their witnesses from the Government, not the district courts", *Quinn*, 728 F.3d at 262, this has been done. As to the second factor, Klepadlo, who was present at the hearing, is available to testify. Thus, it is clear that the first two Smith factors are met regarding Klepadlo's testimony.

Next, the court considers the third factor. The "clearly exculpatory" standard is an "exacting" one, and the Court in *Quinn*, 728 F.3d at 262, stated, "[t]estimony

27

that is at best speculative, severely impeached by the witness's prior inconsistent statement(s), ambiguous on its face, or even if believed, would not in itself exonerate the defendant, is not clearly exculpatory." As such, "[a] [d]efendant's motion for a new trial for failure of the government to give a witness use immunity based on a due process violation fails unless he shows that the witness' testimony was clearly exculpatory. However, 'though exculpatory on its own, defense evidence that is *overwhelmingly* undercut or undermined by substantial prosecution evidence in the record becomes so lacking in credibility that it cannot be *clearly* exculpatory.'" *Id*. at 263.

Initially, the court finds that defendants "[have] not carried [their] substantial burden of showing that the Government's decision [not to give Klepadlo use immunity] was made with the deliberate intention of distorting the judicial factfinding process." Yu Xue, 2018 WL 3647900, *8 (internal quotations and citation omitted). "[Defendants'] speculation about the reason for [refusing to give Klepadlo use immunity] does not permit a finding that the Government intended to deprive [them] of the right to [Klepadlo's] testimony." *Id*. (citation omitted).

The court also finds that the defendants have failed to meet the "clearly exculpatory" standard with respect to Klepadlo's testimony. The defendants essentially contend that the crimes charged against them are entirely attributable to Klepadlo and his employee Joseph Sheposh, and that Klepadlo's testimony will

28

contradict the government's evidence of their guilt. However, it cannot be ignored that the government has already produced at trial a substantial amount of evidence directly implicating both defendants in the crimes they are charged with in the indictment based on their own conduct. The court does not fully repeat the government's extensive testimony and evidence to date presented at trial. Suffice to say that on the record at the December 1, 2021 hearing, after the parties discussed the Smith factors, the court summarized some of the large amount of evidence that the government has presented in the trial against the defendants and explained why defendants did not show that Klepadlo's testimony is "clearly exculpatory." As the Court stated in *Quinn*, 728 F.3d at 263, "[t]he existence of conflicting evidence does not affect, …, whether the defense evidence is exculpatory, though it may affect its weight."

In his recent letter brief, Evans, Sr., (Doc. 162 at 2), argues that:

Mr. Klepadlo's testimony is clearly exculpatory to Mr. Evans, Sr.'s defense. Counts One through Twenty-Four of the Superseding Indictment (with the exception of Count 6 which solely pertains to Bruce Evans, Jr.) charge Mr. Evans, Sr. with operating and failing to report environmental permitting violations at the [GTSA] wastewater treatment plant. Mr. Klepadlo would testify that he–and not Mr. Evans, Sr.–was the "operator" of the GTSA during each alleged charge for which the Government has indicted Mr. Evans, including every alleged violation of the Clean Water Act ("CWA").

As such, it is expected that Mr. Klepadlo will also testify truthfully it was his responsibility to operate and maintain the GTSA plant in accordance with [NPDES Permit] and the overarching CWA. Mr. Klepadlo is expected to testify that Mr. Evans, Sr. maintained no knowledge of the falsified sampling and testing underlying the Superseding Indictment, that Mr. Evans, Sr. was

assured the sampling and testing were performed properly, and that the GTSA was being operated in accordance with the NPDES Permit. Mr. Klepadlo is expected to testify that at no time did Mr. Evans, Sr. test, sample, or participate in a process control decision. Plainly, Mr. Klepadlo's testimony is exculpatory to Mr. Evans, Sr.'s theory of defense – that, at no time, did Mr. Evans, Sr. step out of his role as "business manager" of the GTSA and assume Mr. Klepadlo's responsibilities as "operator."

Evans, Sr. also points out that several times "during the Government's investigation of the GTSA and before he pled guilty, Mr. Klepadlo told law enforcement that at no time was Mr. Evans, Sr. an 'operator' of the GTSA."

Evans, Jr. also contends that Klepadlo has exculpatory evidence regrading the charge in Count 6 against him, i.e., the false statement charge with respect to his operator license he filed with PADEP, since it was Klepadlo who signed and certified his application.

The government, (Doc. 150 at 2-3), responds:

It was the Government who adduced evidence of Klepadlo's investigation and indictment. It was the Government who called Sheposh to testify and subjected him to cross-examination. The fact that Klepadlo was the contracted plant operator at the times charged in the Evans' Superseding Indictment does not relieve either defendant of responsibility under the Clean Water Act. It matters not that Evans, Sr. was not a "licensed operator" in order for him to be found guilty of the crimes charged, or that Evans, Jr. was operating the GTSA under the "supervision" of Klepadlo as the licensed operator. Nor can the defendants demonstrate that the testimony is "essential" as the jury has already heard from Sheposh on the issue of the false DMRs, and the fact that Klepadlo was the licensed operator and that Sheposh was the operator until March 2017.

The court finds that the failure of the government to immunize Klepadlo is not necessary to protect either of the defendant's right to present an effective

30

defense. As to Evans, Sr., it makes no difference that he was not the "operator" since this is not an element of the offenses charged, as "any person" can be liable for CWA violations, and since the indictment also charges both defendants with aiding and abetting the CWA violations. Thus, it is sufficient if the government can show that defendants knew about the violations, such as the sewer overflow at the pump stations, and that they allowed the wastewater haulers to continue to dump wastewater at the stations despite the fact that it was overflowing or that it exceeded permitted capacity for the GTSA. The government has presented an abundance of evidence against Evans, Sr. with respect to the CWA violations, including evidence showing that he was well aware of wastewater overflows and his own statements to FBI agents that although he did not read the NPDES permit and he was not the operator of the GTSA, he admitted that he knew that the overflow of wastewater at pump stations violated the permit and the CWA. The government also produced evidence that during his interview by agents, Evans, Sr. indicated that he was aware of the PADEP notice of violations at the GTSA and indicated that he informally advised the other board members of the violations yet he failed to do so according to the testimony of some of the board members. Also, as the government states, (Doc. 159 at 3), "the defendants claim that Klepadlo continued to commit CWA act crimes while under federal indictment"[] "[y]et,

Evans, Sr. knew precisely what Klepadlo was accused of doing as of September

2016." Further, the government, (Id.), states:

> Evans, Sr. is aware of Klepadlo's position with respect to who he believes is responsible for his criminal problems - Joe Sheposh. Yet, Joe Sheposh is not fired. On the contrary, the Court has already heard testimony that Joe Sheposh was performing all of the "dirty work" at the GTSA and was never fired, nor was he ever reprimanded. In fact, both Klepadlo and Evans, Sr. persuaded him to stay and promised to get him help to do his job. Both Klepadlo and Evans, Sr. continued to allow Sheposh to operate the plant while Evans, Jr. positioned himself to be hired by Evans, Sr. as the new assistant GTSA plant operator in September 2017. All of these maneuvers and others were unknown to the GTSA board members, and in direct defiance of the documented directives of the GTSA board members.

The government's evidence undercuts Evans, Sr.'s theory that Klepadlo is

solely responsible for the CWA violations and not him since Klepadlo was the

operator. The jury has already heard evidence regarding the CWA charges both

defendants face which occurred over several years and which involve alleged

violations of the GTSA's CWA permit, and that several of the charges occurred

while Klepadlo was the GTSA's engineer and a certified operator. In fact, as the

government has stated, (Doc. 149 at 4), "all of the CWA permit violations contained

in Counts 1-5 and 7-24 [of the indictment] concern[] alleged crimes that occurred

while Klepadlo was the GTSA engineer and a certified WWTP operator at the

plant." In short, the testimony of Klepadlo that Evans, Sr. believes he would be

able to elicit if he is granted immunity, does not exonerate Evans, Sr. for the

charged offenses. In any event, even without Klepadlo's testimony, the jury has

heard extensive evidence, via cross-examination, regarding the theories of Evans, Sr., basically that the charged CWA violations are attributable to Klepadlo and Sheposh and not him. Nor does the proposed testimony of Klepadlo contradict the voluminous evidence that the government has presented to the jury that even if Klepadlo was the operator of the GTSA, Evans, Sr. was also involved with and aware with the numerous CWA violations charged in the indictment as an aider and abettor.

Regarding Evans, Jr. and Count 6, his counsel has already repeatedly brought out testimony that Klepadlo signed and certified his PADEP operator application. The jury has also heard testimony regarding Klepadlo's June 29, 2017 alleged false statement that Evans, Jr. had been performing 15 hours of "operating duties" a week at the GTSA since January of 2010. (*See* Govt. Ex. 36). Further, as the government points out, (Doc. 149 at 2), Laura Chambers, a PADEP employee, testified that "part of Evans Jr.'s application [to become a certified WWTP operator] contained a certification by Klepadlo that Evans Jr. had worked for him since January of 2010 performing tasks at the GTSA plant that were relevant to PADEP's evaluation of Evans Jr.'s experience in operating such plants", and essentially that even though "the information provided by Klepadlo about Evans Jr.'s WWTP-related work activity [was allegedly] false", Evans Jr. nonetheless submitted his application to PADEP in August, 2017. Thus, the jury has already heard evidence

33

regarding Klepadlo's involvement with Evans, Jr.'s application and will be able to weigh all of this testimony and evidence regarding its verdict on Count 6.

Thus, the court finds that the defendants' due process rights are not violated by the government's refusal to grant Klepadlo use immunity since they are not being deprived of "clearly exculpatory evidence necessary to present an effective defense." *Smith,* 615 F.2d at 971.

Moreover, Klepadlo will be permitted to testify as to some of the matters discussed above, within the specified parameters, since the court has found that he does not have a 5th Amendment privilege as to some matters.

In Quinn, the Third Circuit stated that "the court can stop its case-specific analysis once it decided the testimony was not clearly exculpatory." Yu Xue, 2018 WL 3647900, *8. A "defendant is not entitled to a new trial if he fails to show that the proposed witness's testimony was clearly exculpatory, and if defendant has not made this showing, the court does not need to consider the final two Smith factors of whether proposed witness's testimony was essential or whether the Government had a strong countervailing interest for refusing to grant [Klepadlo] immunity." *Id*. (citing *Quinn*, 728 F.3d at 263). *See also* Gibson, 2020 WL 2849988, *7 ("the Court of Appeals in *Quinn* stopped its case-specific analysis once the Court decided the testimony was not clearly exculpatory."). Nonetheless, even though the court is not required to consider the last two Smith factors because the

34

defendants have failed to show that Klepadlo's anticipated testimony is "clearly exculpatory", it will do so to be thorough.

The fourth <u>Smith</u> factor is that the testimony must be essential. As discussed in detail above, Sheposh has testified extensively regarding the numerous false DMRs that he submitted to PADEP, and much evidence and testimony has been heard by the jury that Klepadlo was the GTSA engineer and a licensed operator at the plant as well as evidence that Sheposh was the operator until March 2017. Klepadlo's testimony is not essential to further substantiate this evidence already in the record. Nor is Klepadlo's testimony essential as to Count 6 against Evans, Jr., as discussed above. Thus, the defendants have failed to show that Klepadlo's testimony is "essential."

With respect to the fifth <u>Smith</u> factor, the court finds that there is a strong governmental interest in not granting Klepadlo immunity. The government, (Doc. 150 at 3), explains its position as follows:

> Klepadlo and Evans, Sr. acted together to defraud the citizens of Greenfield Township in order to personally advance their own interests. Each had their own agenda as the evidence has borne out. The evidence thus far demonstrates that both Klepadlo and Evans, Sr. knew what Sheposh had done but ignored what he did in order to advance their own interests. In doing so, Klepadlo and the defendants violated the public trust, endangered the environment, and placed the GTSA on the brink of bankruptcy. Meanwhile, citizens of Greenfield Township have seen their sewer fees drastically increase with another increase on the horizon.

Additionally, the defendants have failed to show that there are not any strong governmental interests which countervail against a grant of immunity for Klepadlo.

Finally, based on the hearing and the submissions of the parties, the court finds that there is no evidence that "the Government [] engage[d] in intimidation or threats to dissuade [Klepadlo] from testifying." Yu Xue, 2018 WL 3647900, *9 (citing Quinn, 728 F.3d at 258). Nor does "the evidence [] show that the Government's conduct was aimed at keeping [Klepadlo] from [] testifying at trial." Id. Rather, the court finds that [Klepadlo's] decision not to testify after being [subpoenaed] was his alone to make with the advice of his counsel." Id.


IV.     CONCLUSION

For the aforementioned reasons, Klepadlo's motion to quash the trial subpoena of defendant Evans Sr.'s to preclude the defendants from calling him as witness at his trial and compelling him to testify based on his 5th Amendment privilege against self-incrimination, **(Doc. 132)**, will be **GRANTED IN PART** and, **DENIED IN PART**, as specified above. An appropriate Order follows.


                                        s/ Malachy E. Mannion
                                        **MALACHY E. MANNION**
                                        **United States District Court**

**Dated: December 8, 2021**
19-09-07